UNITED STATES of America ex rel. Roderick STILLWELL; and Roderick Stillwell, in his own right, Plaintiffs,

v.

HUGHES HELICOPTERS, INC.; McDonnell Douglas Helicopter Co.; Parker Hannifin Corp.; Edward E. Vukonich; James P. Coyne; and Does 1 through 50, inclusive, Defendants.

No. CV 87–1840–WDK.

United States District Court, C.D. California.

June 1, 1989.

---

Law Offices of William R. Ramsey, William R. Ramsey, Louis J. Cohen, Encino, Cal., for plaintiff Roderick Stillwell.

Bryan, Cave, McPheeters & McRoberts, Robert F. Scoular, F. Michael Gaffney, Glenn E. Monroe, Andria K. Richey, Los Angeles, Cal., for defendants Hughes Helicopters, Inc. McDonnell Douglas Helicopter Co.

Crowell & Moring, Patrick W. Lee, Julie Crohovsky, Washington, D.C., Clinnin, Siracuse & Belcher, Philip Siracuse, Richard Salcido, Los Angeles, Cal., for defendant Parker Hannifin Corp.

Quinn, Kully & Morrow, John J. Quinn, Eric L. Dobbersteen, Lisa L. Kantor, Los Angeles, Cal., for defendant James P. Coyne.

Sharenow & Corbin, Robert L. Corbin, Los Angeles, Cal., for defendant Edward E. Vukonich.

Morgan J. Frankel, Asst. Counsel, Washington, D.C., amicus curiae for U.S. Senate.

KELLER, District Judge.

This matter is before the Court on defendants McDonnell Douglas Helicopter Company and Parker Hannifin Corporation's motions to dismiss this action for lack of subject matter jurisdiction under Fed.R. Civ.P. 12(b)(1). The defendants ask this Court to declare the 1986 amendments to the *qui tam* sections of the False Claims Act, *see* 31 U.S.C.A. section 3730 (West Supp.1988), unconstitutional.

The defendants assert three bases for this challenge. First, they contend that the 1986 amendments violate the separation of powers doctrine because the new provisions confer litigative discretion on private plaintiffs and the judiciary, thus encroaching on the constitutional power of the executive branch to "take Care that the Laws be faithfully executed." U.S. Const. art. II, section 3. Second, the defendants urge that the amended False Claims Act violates the Appointments Clause, U.S. Const. art. II, section 2, because Congress "appoints" relators to prosecute *qui tam* actions, a power that is exclusively vested in the executive branch. Finally, the defendants contest the congressional grant of standing to bring a *qui tam* action to a private party. They argue that a relator cannot allege the constitutionally minimum injury-in-fact, and thus the amended False Claims Act abrogates the "case or controversy" limitation embodied in Article III.

I. General Presumptions:

In these motions, this Court has been asked to pass on the constitutionality of an Act of Congress—" 'the gravest and most delicate duty that [the federal courts] are

called upon to perform.'" *Rostker v. Goldberg,* 453 U.S. 57, 64, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981). When reviewed for constitutional infirmities, congressional enactments are presumptively valid. *Fullilove v. Klutznick,* 448 U.S. 448, 472, 100 S.Ct. 2758, 2771, 65 L.Ed.2d 902 (1980). Thus, "[w]hen [a federal court] is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, particularly an Act of Congress that confronts a deeply vexing national problem, it should only do so for the most compelling constitutional reasons." *Mistretta v. United States,* — U.S. —, —, 109 S.Ct. 647, 661, 102 L.Ed.2d 714 (1989), *quoting Bowsher v. Synar,* 478 U.S. 714, 736, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986) (Stevens, J., concurring). Whether this Court agrees or disagrees with the particular method chosen by the Congress to address this problem is immaterial. Without a constitutional bar, it is not for this Court

> to limit the State in resorting to various weapons in the armory of the law. Whether proscribed conduct is to be visited by a criminal prosecution or by a *qui tam* action or by an injunction or by some or all of these remedies in combina-

tion is a matter within the legislature's range of choice.

*Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469 (1957).

## II. Separation of Powers:

*Qui tam*[1] laws originated in England and are firmly rooted in the American legal tradition. Of the fourteen statutes imposing penalties enacted by the First Congress, between ten and twelve authorized *qui tam* suits.[2] Although most of these statutes resembled simple informer laws, the idea of private citizen enforcement of public rights is embedded in our constitutional system.[3] The First Congress' incorporation of the *qui tam* concept into American law "provides contemporaneous and weighty evidence" that the concept is consistent with the constitutional principle of separation of powers. *Bowsher v. Synar,* 478 U.S. 714, 723, 106 S.Ct. 3181, 3187, 92 L.Ed.2d 583 (1986) (citation omitted).

This challenge is something of an anomaly, because the executive branch—whose authority is purportedly undermined by this law—has not appeared in this action to contest the statutory scheme. As *amicus curiae* the United States Senate points out, and as this Court's review of the case law

1. The connotation *"qui tam"* is derived from the Latin phrase *"qui tam pro domino rege quam pro se ipso in hac parte sequitur,"* which means "who brings the action for the king as well as for himself." *See* W. Blackstone, Commentaries on the Law of England \*160 (1768).

2. Ten statutes authorized *qui tam* actions in certain circumstances. *See* Act of July 31, 1789, ch. 5 sections 29, 38, 1 Stat. 29, 44–45, 48 (1789) (import duties); Act of Sept. 1, 1789, ch. 11 section 21, 1 Stat. 55, 60 (1789) (vessel registration); Act of March 1, 1790, ch. 2 sections 3, 6, 1 Stat. 101, 102–03 (1790) (census); Act of May 31, 1790, ch. 15 section 2, 1 Stat. 124, 124–25 (1790) (copyright infringement); Act of July 5, 1790, ch. 25 section 1, 1 Stat. 129 (1790) (census); Act of July 5, 1790, ch. 25, section 1, 4, 1 Stat. 131, 133 (1790) (seamen regulations); Act of July 22, 1790, ch. 33 section 3, 1 Stat. 137, 137–38 (1790) (regulation of Indian trade); Act of Aug. 4, 1790, ch. 35 sections 55, 69, 1 Stat. 145, 173, 177 (1790) (import duties); Act of Feb. 25, 1791, ch. 10 sections 8, 9, 1 Stat. 191, 195–96 (1791) (regulation of Bank of United States); Act of Mar. 3, 1791, ch. 15 section 44, 1 Stat. 199, 209 (1791) (liquor duties).

Two statutes gave informers a share of recovered penalties without expressly granting them standing to sue. *See* Act of Sept. 2, 1789, ch. 12 section 8, 1 Stat. 65, 67 (1789) (regulation of Treasury officers); Act of Mar. 3, 1791, ch. 8, section 1, 1 Stat. 215 (1791) (extending same). These statutes were apparently interpreted to authorize *qui tam* actions. *See Adams, qui tam v. Woods,* 6 U.S. (2 Cranch) 336, 341, 2 L.Ed. 297 (1805) (where statute authorizing informer reward is unclear, it will be interpreted to permit *qui tam* actions).

3. In addition to the False Claims Act, there are at least four other federal *qui tam* laws now in force: 18 U.S.C.A. section 962 (West 1976) (forfeitures of vessels privately armed against friendly nations); 25 U.S.C.A. section 201 (West 1983) (recovery of penalties for violation of Indian protection laws); 35 U.S.C.A. section 292 (West 1984) (penalties for patent infringement); and 46 U.S.C.A. section 723 (West 1975) (forfeiture of vessels taking undersea treasure from the Florida coast to foreign nations).

confirms, no reported decision has ever invalidated a statute because of undue intrusion on executive branch authority when the executive has expressly declined to oppose the law. Thus, the defendants ask this Court to entertain a separation of powers challenge to the amended False Claims Act without the participation of the affected branch.

### A. General Principles:

The separation of powers doctrine springs from "the central judgment of the Framers that, within our constitutional scheme, the separation of governmental powers is essential to the preservation of liberty." *Mistretta v. United States*, — U.S. at ——, 109 S.Ct. at 659. The doctrine does not require, however, that each of the three branches must be entirely separate and distinct. *Morrison v. Olson*, — U.S. ——, ——, 108 S.Ct. 2597, 2620, 101 L.Ed.2d 569 (1988). Nor does the doctrine require a "hermetic division" between the branches. *Mistretta v. United States*, — U.S. at ——, 109 S.Ct. at 659. The separation of powers doctrine recognizes that our tripartite system of government embodies a flexible Madisonian system of checks and balances, which strives to achieve " 'separateness but interdependence, autonomy but reciprocity.' " *Id.*, *quoting Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).

The separation of powers doctrine arises from the realization that there is an "hydraulic pressure within each of the separate branches to exceed the outer limits of its power." *Buckley v. Valeo*, 424 U.S. 1, 122, 96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) (per curiam). The doctrine acts as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of another." *Id.* Thus, courts must be vigilant against provisions of law that concentrate in a single branch powers more appropriately diffused among separate branches or that undercut the authority and independence of one coordinate branch. *Mistretta v. United States*, — U.S. at ——, 109 S.Ct. at 659–60.

The prohibition against encroachment or aggrandizement has resulted in the invalidation of congressional attempts to exercise the powers of other branches or to reassign authorities vested by the Constitution in either the judicial or the executive branches. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986) (Congress may not exercise removal power over officer performing executive functions); *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (Congress may not enact laws except through Article I procedures); *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Congress may not assign Article III powers to Article I judges). However, the commingling of the functions of the branches, without encroachment or aggrandizement, presents but does not constitute a constitutional problem. *See, e.g., Mistretta v. United States*, — U.S. ——, 109 S.Ct. 647 (Congress' creation and placement of the Sentencing Commission in the judicial branch is constitutional); *Morrison v. Olson*, — U.S. ——, 108 S.Ct. 2597 (judicial appointment of independent counsel upheld); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) (agency's assumption of jurisdiction over adjudication of state law counterclaims does not undermine judicial branch authority); *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (legislation providing for General Services Administration control of presidential papers after resignation upheld).

Because this case involves powers of the executive branch, this Court should consider whether the amended False Claims Act "impermissibly undermine[s]" the powers of the executive, *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. at 856, 106 S.Ct. at 3260, or "disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions," *Nixon v. Administrator of General Services*, 433 U.S. at 443, 97 S.Ct. at 2790. Because the defendants also argue that the Act expands the

powers of the judicial branch by allowing it to impact an executive function, the Court must further determine whether the Act assigns to the judicial branch "tasks that are more appropriately accomplished by [other] branches," *Morrison v. Olson,* —— U.S. at ——, 108 S.Ct. at 2601, or "impermissibly threatens the institutional integrity of the Judicial Branch," *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. at 851, 106 S.Ct. at 3258.

### B. The Executive Branch's Litigative Function:

■ Under Article II, section 3, of the United States Constitution, the President "shall take care that the laws be faithfully executed." This clause gives the power to enforce the laws of the United States to the executive branch. *Springer v. Philippine Islands,* 277 U.S. 189, 202, 48 S.Ct. 480, 482, 72 L.Ed. 845 (1928). In general, this power includes the authority to investigate and litigate offenses against the United States. *Buckley v. Valeo,* 424 U.S. at 138–39, 96 S.Ct. at 691–92; *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). The Attorney General acts as the agent of the United States in all civil and criminal suits brought by or on behalf of the United States, and " 'all such suits, so far as the interests of the United States are concerned, are subject to the direction, and within the control of, the Attorney General.' " *Buckley v. Valeo,* 424 U.S. at 139, 96 S.Ct. at 691, *quoting Confiscation Cases,* 74 U.S. (7 Wallace) 454, 458–59, 19 L.Ed. 196 (1869); *see also United States v. San Jacinto Tin Co.,* 125 U.S. 273, 279, 8 S.Ct. 850, 853, 31 L.Ed. 747 (1888) (The Attorney General "is undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and of the litigation which is necessary to establish the rights of the government.") However, the power to enforce the laws does not mean that some of the power, authority, and discretion to initiate a lawsuit on behalf of the United States cannot be delegated by Congress to anyone other than a duly appointed officer of the United States. As stated in *Mistretta v. United States,* the analytical focus should be on encroachment or aggrandizement, not the intermixing of functions. For example, in spite of the executive's Article II enforcement power, federal courts possess inherent authority to initiate a criminal contempt proceeding and to appoint a private attorney to prosecute the contempt in the interest of effectuating their judgments. *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987); *see also In re Certain Complaints Under Investigation,* 783 F.2d 1488, 1505 (11th Cir.1986) (upholding statute authorizing judicial council to investigate improper conduct by federal judge), *cert. denied sub nom. Hastings v. Godbold,* 477 U.S. 904, 106 S.Ct. 3273, 91 L.Ed.2d 563 (1986).[4]

The recent case of *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, demonstrates the extent to which the litigative authority may be commingled among the branches. That case upheld, against a separation of powers challenge, the Ethics in Government Act of 1978, 28 U.S.C.A. sections 49, 591–99 (West Supp.1988). Under the Ethics in Government Act, if the Attorney General determines that there are reasonable grounds to believe that a person covered by the Act may have violated the law, he must apply to the Special Division—a division of the United States Court of Appeals for the District of Columbia—for the ap-

---

4. In *Young v. United States ex rel. Vuitton et Fils S.A.,* the Court reversed the convictions obtained by the private attorney appointed by the district court because that attorney represented an interested party in the underlying action. *Id.* 481 U.S. at 814, 107 S.Ct. at 2141. The Court based this reversal on the special responsibility of a federal prosecutor to seek justice, not merely a conviction. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). Because of the potential for private interest to influence the discharge of the public duty of prosecution, the appearance of impropriety was enough to invalidate the convictions. *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. at 805–06, 107 S.Ct. at 2136–37. The defendants note that the *qui tam* plaintiff has an interest in the judgment by virtue of the statutory bounty. The rationale for reversing the convictions in *Young*—financial interest—does not apply here because this case involves a civil suit, not a criminal prosecution that presents fair trial concerns.

pointment of an independent counsel. Upon receiving that application, the Special Division must "appoint an appropriate independent counsel and define that independent counsel's prosecutorial jurisdiction." 28 U.S.C.A. section 592(d). The independent counsel has a full range of prosecutorial powers, including conducting grand jury proceedings, initiating investigations, and undertaking prosecutions. *See* 28 U.S.C.A. section 594.

The Supreme Court turned aside the constitutional challenge because the statutory scheme does not unduly concentrate authority in one branch or undermine the powers of a coordinate branch. First, the Court noted that there is no danger of congressional usurpation of executive power under the statute, because, with the exception of impeachment, Congress retains no powers of control or supervision. *Morrison v. Olson*, —— U.S. at ——, 108 S.Ct. at 2621.

Second, the Court found that the Act does not work a "judicial usurpation of properly executive functions." *Id.* at ——, 108 S.Ct. at 2621. Although the judicial branch appoints the independent counsel and defines his jurisdiction, the Special Division can do so only after the application of the Attorney General. The Attorney General's decision not to seek appointment is unreviewable, *see* 28 U.S.C.A. section 592(f), and the Special Division's power ends after appointment and definition of jurisdiction. Thus, "the various powers delegated by the statute to the Division are not supervisory or administrative, nor are they functions that the Constitution requires be performed by officials within the Executive Branch." *Id.*

Third and most important, the Ethics in Government Act does not undermine the powers of the executive branch or prevent it from accomplishing its constitutionally assigned functions. The Court noted that the Act does limit the executive branch's control over a class of criminal prosecu-

tions—the Attorney General may not appoint the individual of his choice, he does not determine the counsel's jurisdiction, and his power to remove the counsel is limited to for cause dismissal. However, the Act does give the Attorney General significant control over an independent counsel. The Attorney General may remove a counsel for good cause, which "provides the Executive with substantial ability to ensure that the laws are 'faithfully executed' by an independent counsel." *Id.* Furthermore, the Attorney General retains control over the initiation of a lawsuit, because an independent counsel may not be appointed without the Attorney General's request, and his decision not to seek appointment is a matter of unreviewable discretion. *Id.* Finally, the jurisdiction of the counsel is determined with reference to the facts submitted by the Attorney General. For these reasons, the Court concluded that

> Notwithstanding the fact that the counsel is to some degree "independent" and free from Executive supervision to a greater extent than other federal prosecutors, in our view these features of the Act give the Executive Branch *sufficient* control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties.

*Id.* at ——, 108 S.Ct. at 2622 (emphasis added).

■ The language of this holding is carefully limited. The executive branch must have "sufficient" control, not absolute or total control. Thus, *Morrison v. Olson*, as even the dissent in that case recognized, *see id.* at ——, 108 S.Ct. at 2629 (Scalia, J., dissenting), stands for the proposition that the degree of control exercised by the executive branch over a suit on behalf of the United States is determinative of the separation of powers issue.[5] As a result, this Court must examine the specific provisions of the False Claims Act to determine

---

5. Respect for the rule of law, which gives shape to this Court's analysis of the separation of powers issue, does not preclude an observation regarding the present state of this constitutional doctrine. The balancing test announced in *Mor-* *rison v. Olson*, seemingly, replaces the "clear constitutional presumption that the executive authority belongs to the President." *Morrison v. Olson*, —— U.S. at ——, 108 S.Ct. at 2629 (Scalia, J., dissenting).

whether the litigative function of the executive has been impermissibly undermined or usurped by another branch.

## C. The 1986 Amendments and Executive Branch Control:

The False Claims Act was originally enacted in 1863. *See* Act of March 2, 1863, ch. 67, 12 Stat. 696. Since its inception, the Act's substantive provisions have been amended twice, in 1943, *see* Pub.L. No. 213, ch. 377, 57 Stat. 608 (1943), *codified in* 31 U.S.C.A. section 3730 (West 1982), and in 1986, *see* Pub.L. 99–562, 100 Stat. 3154 (1986), *codified in* 31 U.S.C.A. section 3730 (West Supp.1988). In the original version of the Act, the government had no right to take over the action once a *qui tam* plaintiff commenced a false claims action. At least one court held that the relator's interest in the action was a property right that could not be divested by the government if it attempted to settle the dispute with the defendant. *See United States v. Griswold,* 30 F. 762 (Cir.Ct., D.Or. 1887).

The 1943 version of the Act broadened the government's authority to take over a *qui tam* action, by granting the government a sixty-day period in which to review the complaint and proceed with the action. *See* 31 U.S.C.A. section 3730(b)(2)(A) (West 1982). However, if the government declined to participate initially, it had no right to reenter the action after the expiration of the review period. *See id.*

■ The 1986 version of the False Claims Act continues the evolution of greater executive control over *qui tam* lawsuits. As in prior versions of the Act, the relator is given substantial authority to direct the initiation, conduct and termination of litigation in the name of the United States. However, the government is accorded much more authority to restrain the relator, if it chooses to do so. For example, the new amendments have considerably relaxed the bar to government reentry in the suit, which Congress recognized could very well "work to the detriment of the Government's interests." S.Rep. No. 99–345, 99th Cong. 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5266, 5291. As set forth below, the Act's new provisions are carefully crafted to enable the executive to enter the action and take control of the course of the litigation.

### 1. Initiation of Litigation:

Under the statutory scheme, the Attorney General has the right to initiate a false claims action. 31 U.S.C.A. section 3730(a). If the government has already initiated litigation, a private party is jurisdictionally barred from suing on the underlying facts. 31 U.S.C.A. section 3730(e)(3). Even if the government has not initiated a suit, but instead has publicly disclosed the findings of an investigation, a private party may not sue unless he can demonstrate that he is an original and independent source of the information forming the basis for his cause of action. 31 U.S.C.A. section 3730(e)(4)(A)–(B). If the suit threatens to compromise criminal law enforcement efforts, national security, or other interests, the government may move to dismiss the complaint or stay discovery at any time. 31 U.S.C.A. section 3730(c)(2)(A); 3730(c)(3).

The relator can file a suit without the consent of the Attorney General, *see* 31 U.S.C.A. section 3730(b), and then sue in the name of the United States,[6] 31 U.S.C.A. section 3730(b)(1). If a private person does initiate a *qui tam* action, however, the government has wide latitude to assume the conduct of the litigation. The complaint must be filed by the relator *in camera,* with a copy of the complaint and all material information possessed by the relator served on the government. 31 U.S.C.A.

---

**6.** Under 25 U.S.C. section 201, the *qui tam* plaintiff is expressly authorized to sue in the name of the United States. Under most private attorneys general statutes, citizen plaintiffs may only commence suits on their own behalf. *See, e.g.,* 15 U.S.C.A. section 2619(a) (West 1982 and Supp. 1988) (Toxic Substances Act); 16 U.S.C.A. section 1540(g)(1) (West 1982) (Endangered Species Act); 30 U.S.C.A. section 1270(a) (West 1982) (Surface Mining Control and Reclamation Act); 33 U.S.C.A. section 1365(a) (West 1982 and Supp.1988) (Clean Water Act); 42 U.S.C.A. section 4911(a) (West 1982) (Noise Control Act); 42 U.S.C.A. section 7604(a) (West 1982) (Clean Air Act).

section 3730(b)(2). The government has sixty days to investigate the underlying facts and determine whether to assume the conduct of the litigation. 31 U.S.C.A. section 3730(b)(2). On a showing of good cause, the government may be granted an extension of this review period. 31 U.S.C.A section 3730(b)(3). Furthermore, no person other than the government may intervene or bring an action based on the underlying facts. 31 U.S.C.A. section 3730(b)(5).

The only judicial involvement at this stage of the *qui tam* suit is in the determination of good cause if the government seeks to extend the investigative period. The showing of good cause to extend the investigative period is not particularly onerous, nor does it involve judicial usurpation of executive functions. Instead, it allows the executive to pursue a more extensive investigation of the relator's allegations if necessary.

### 2. Conduct of Litigation:

The relator is subject to a host of controls designed to permit the reassertion of executive litigative authority. If the government does decide to intervene at the outset of the action, the government has primary authority for the prosecution of the action and is not bound by any act of the person originating the action. 31 U.S.C.A. section 3730(c)(1). Although the relator remains a party to the action, *see* 31 U.S.C.A. section 3730(c)(1), the government may limit the relator's authority, on application to the court, to call witnesses, to enter witnesses' full testimony, and to cross-examine adverse witnesses. 31 U.S.C.A. section 3730(c)(2)(C)(i)-(iii). In addition, either the government *or* the defendant may limit the relator's unrestricted participation in the litigation on a showing of delay, interference, harassment, or undue burden. 31 U.S.C.A. sections 3730(c)(2)(C)(iv), 3730(c)(2)(D).

If the United States does not intervene, or decides to withdraw, the government must still be served with all pleadings and deposition transcripts, *see* 31 U.S.C.A. section 3730(c)(3), and can apply to the trial court to reenter the suit at any time, *see* 31 U.S.C.A. section 3730(c)(3). Although the relator's control over a suit in which the government has declined to intervene may include the ability to make admissions on behalf of the United States, answer interrogatories, and trigger the doctrines of res judicata and collateral estoppel, the government is not barred from litigating the same issue with different parties or relating to different facts. *Cf. United States v. Stauffer Chemical Co.*, 464 U.S. 165, 173–74, 104 S.Ct. 575, 579–81, 78 L.Ed.2d 388 (1984). Furthermore, these authorities end with the government's reentry into the suit. *See* 31 U.S.C.A. section 3730(c)(1). Finally, the government may apply to the court to stay the relator's discovery—even if it decides not to intervene or withdraws from the action—on a showing that such discovery would interfere with an ongoing investigation. 31 U.S.C.A. section 3730(c)(4).

In this case, the real nub of the defendants' complaint is that a private party may continue with a civil false claims suit after the government initially declines to proceed or proceeds and then subsequently withdraws. They assert that the *qui tam* plaintiff's independent right to sue will lead to needless litigation and meritless suits. The defendants fail to note, however, that a "loose cannon plaintiff" is subject to a variety of legal constraints and practical disincentives. First, as in any lawsuit, the Federal Rules of Civil Procedure allow for summary disposition of a groundless suit. If the action is truly lacking in merit, a defendant may resolve a false claims action on a motion to dismiss or a motion for summary judgment. Second, if a persistent plaintiff abuses his *qui tam* authority, he is subject to sanctions imposed by the court under Fed.R.Civ.P. 11 or 28 U.S.C. section 1927. Third, a plaintiff who files a frivolous claim under the Act can be held liable for attorney's fees and costs under 31 U.S.C.A. section 3730(d)(3). Fourth, although the statutory bounty provides a significant incentive to sue, the *qui tam* plaintiff faces often onerous litigation before realizing any recovery. As in this case, a false claims plaintiff will usually confront defendants with significant litigation cof-

fers and access to preeminent legal talent. If the suit does proceed to trial, the plaintiff frequently is faced with a complex case requiring a substantial investment of time to plead and prove. If any award is finally gained, an immediate appeal is a strong likelihood. Thus, a plaintiff's lawyer in a false claims action, invariably working on a contingency fee basis, faces enormous practical disincentives to proceeding with the suit. Fifth, if the suit is wholly without merit or threatens a governmental interest, the executive branch may intervene at any time and settle or dismiss the suit. *See* 31 U.S.C.A. sections 3730(c)(2)(A)–(B), 3730(c)(3).

The defendants emphasize that government intervention after the initial sixty-day review period requires a showing of good cause. *See* 31 U.S.C.A. section 3730(c)(3). They note that, unlike most citizen's suit provisions, in which intervention is of right,[7] the False Claims Act provides the government with only a right of permissive intervention. This provision, the defendants assert, may work two evils. First, the necessity of court approval limits executive discretion and threatens executive authority. Second, if a court does refuse to let the government intervene, an inexperienced or incompetent plaintiff's counsel may wreak havoc on the judicial process and the defendants.

The defendants' parade of horribles does not withstand scrutiny. The permissive intervention provision of the amended Act is less intrusive in effect than a similar feature of the Ethics in Government Act approved in *Morrison v. Olson*. Under the Ethics in Government Act, the Attorney General may remove, subject to judicial review, an independent counsel for "good cause." *See* 28 U.S.C.A. section 596(a). However, removal for good cause does not end the subject of the investigation—it merely results in the Special Division appointing a new independent counsel. The Attorney General is not permitted to take over or even *participate* in the independent counsel's investigation. In contrast, the amended False Claims Act allows the government to *take over* a false claims action on a showing of good cause even if the government initially declines to intervene. .

The determination of good cause for intervention, which requires an examination of executive interests, is particularly well-suited to the judicial forum. Federal courts routinely engage in this type of evaluation under Fed.R.Civ.P. 24(b). In the criminal arena, federal courts exercise control over the government's participation in investigations by supervising grand juries, *see* Fed.R.Crim.P. 6(e), issuing search warrants, *see* Fed.R.Crim.P. 41, and reviewing applications for wiretaps, *see* 18 U.S.C.A. sections 2516, 2518. Despite the potential for judicial overreaching, the examples cited here have been notable only for the complete lack of executive branch challenges to this limited judicial oversight.

In practical terms, the good cause showing will prove to be a small hurdle. One cannot realistically predict that a heavily docketed federal court, confronted with a major piece of litigation in which a sophisticated and well-resourced defendant squares off against an oft overmatched plaintiff, will not be quick to allow the government to reenter the suit. Such a disparity in litigative experience and capacity, without government involvement, can unnecessarily overburden the court as well as the plaintiff. On the other hand, if the plaintiff's counsel is experienced and competent, the government will gain a formidable ally, thus making intervention a cooperative act or an unnecessary undertaking.

### 3. Termination of Litigation:

If the government does participate in the action, the government may settle or dismiss the action, *notwithstanding* the objections of the relator.[8] 31 U.S.C.A. section

---

7. *See* 15 U.S.C.A. section 2619(c); 16 U.S.C.A. section 1540(g)(3)(B); 30 U.S.C.A. section 1270(c)(2); 33 U.S.C.A. section 1365(c)(2); 42 U.S.C.A. section 4911(c); 42 U.S.C.A. section 7604(c)(2).

8. To demonstrate the purported danger of judicial involvement in settlement approval, the defendants point to *Gravitt v. General Electric Co.,* 680 F.Supp. 1162 (S.D.Ohio), *aff'd without op.,* 848 F.2d 190 (6th Cir.1988). In that case, the

3730(c)(2)(A)–(B). The relator is, however, provided with notice and an opportunity to voice his objections to the proposed action. 31 U.S.C.A. section 3730(c)(2)(A)–(B). In addition, the United States may elect to pursue any alternate remedies available to it, including an administrative proceeding that effectively terminates the suit. 31 U.S.C.A. section 3730(c)(4). The relator cannot object to such a decision. If the government has not intervened, the relator may settle the action or pursue it to final judgment. However, the government must be given notice of the proposed settlement and may apply to the court to intervene and contest a settlement. *See* 31 U.S.C.A. section 3730(c)(3). If the relator seeks to dismiss the action, both the court and the government must give written consent to the dismissal. 31 U.S.C.A. section 3730(b)(1).

The statute's requirement for court approval of the government's settlement or dismissal of a *qui tam* suit raises the specter of disruption of the tripartite balance of government by undermining the executive branch's litigative discretion. However, the need for a court's imprimatur on the government's decision to terminate a case brought on behalf of the United States is not at all unprecedented. For example, the court may accept or reject a plea bargain under Fed.R.Crim.P. 11(e). Similarly, a dismissal of an indictment, information, or complaint under Fed.R.Crim.P. 48(a) can be filed by the government only by leave of the court. Other statutory schemes provide for expansive judicial oversight. *See, e.g.,* 15 U.S.C.A. section 16(e) (court may enter consent judgment proposed by United States in antitrust action only if it is in the public interest).

In sum, utilizing the *Morrison v. Olson* balancing approach, the provisions of the amended False Claims Act ensure that the executive branch can exercise "sufficient control" over the conduct of false claims litigation. The amendments provide far greater executive authority over the conduct of false claims litigation than that provided for in the Ethics in Government Act validated in *Morrison v. Olson.* In effect, the statute *augments* the government's litigative resources by adding to its manpower. In spite of the relative freedom enjoyed by the relator, which still can be curtailed at any time, the independence from the executive branch of a litigator is not a constitutional bar. *Morrison v. Olson,* —— U.S. at ——, 108 S.Ct. at 2622. Because the executive is provided with significant mechanisms to control the relator's role in the suit and to exercise its constitutional authority to enforce the laws, the Court concludes that the amended False Claims Act does not abridge the doctrine of separation of powers.

### III. The Appointments Clause:

The defendants contend that government litigation must be controlled by "officers" of the United States, properly appointed under the Appointments Clause of Article II, section 2, clause 2. This argument is a cousin of their separation of powers theory,

---

district court refused to approve the settlement of a *qui tam* suit proposed by the Department of Justice and the defendant, after the relator objected to the settlement.

This case is hardly supportive of the defendants' position. Mr. Gravitt, the *qui tam* plaintiff, testified at the hearings on the 1986 amendments to the Act. His testimony was so compelling that it was included in the legislative history.

[The witness'] comments were echoed by Mr. John Gravitt, another witness who testified in regard to time card mischarging at a General Electric plant in Ohio. Gravitt agreed that most individuals working in defense contractor plants are afraid to expose fraud. Gravitt also pointed out that without cooperating employees, Government auditors would rarely detect abuses. Gravitt explained that notice of an impending audit normally travels through the contractor plant "like wildfire" and "everybody straightens up their act."

S.Rep. No. 99–345, 99th Cong. 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News at 5270–71. The district court in *Gravitt* determined that the government's proposed settlement was inadequate in light of the enhanced damage provisions and reduced standard of proof provided for in the amended Act. *Gravitt v. General Electric Co.,* 680 F.Supp. at 1164. More importantly, the Department of Justice "took no deposition, interviewed no witness and instead confined its efforts to opposing all attempts by plaintiff's counsel to conduct appropriate discovery." *Id.* In light of these occurrences, it is not surprising that the court refused to approve the settlement.

because it involves a specific constitutional power that Congress is purportedly arrogating to itself.

■ The Appointments Clause provides that

[The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, section 2, cl. 2. The clause applies to all executive and administrative officers who serve pursuant to federal law and who exercise "significant authority" over federal government actions. *Seattle Master Builders Ass'n. v. Pacific Northwest Electric Power and Conservation Planning Council*, 786 F.2d 1359, 1365 (9th Cir.1986), *cert. denied*, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). The clause is addressed to the separation of powers between the President and Congress. *Id., see also Buckley v. Valeo*, 424 U.S. at 126, 96 S.Ct. at 685. If a person is not appointed in any one of the ways enunciated in the clause, he is not, strictly speaking, an officer of the United States. *United States v. Mouat*, 124 U.S. 303, 308, 8 S.Ct. 505, 507, 31 L.Ed. 463 (1888); *United States v. Smith*, 124 U.S. 525, 529–30, 8 S.Ct. 595, 596–97, 31 L.Ed. 534 (1888).

Analytically, relators enjoy limited powers and have no formal duties, hold no established office, have no prescribed tenure, and receive no federal emoluments. They are more appropriately described as government "agents" than as officers for the purpose of the Appointments Clause. *See, e.g., Auffmordt v. Hedden*, 137 U.S. 310, 327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890) (person whose "position is without tenure, duration, continuing emolument, or continuous duties [and who] acts only occasionally and temporarily" is an agent and not an "Officer" as defined by Appointments Clause); *see also Hall v. Wisconsin*, 103 U.S. (13 Otto) 5, 8–9, 26 L.Ed. 302 (1880); *United States v. Germaine*, 99 U.S. (9 Otto) 508, 511–12, 25 L.Ed. 482 (1879); *United States v. Hartwell*, 73 U.S. (6 Wall.) 385, 393, 18 L.Ed. 830 (1868). As a result, *qui tam* plaintiffs need not have been "appointed" consistent with the dictates of the clause. *See, e.g., Melcher v. Federal Open Market Committee*, 644 F.Supp. 510, 521 (D.D.C.1986) ("The Appointments Clause governs the selection of public officers—it says nothing about the exercise of public power by private persons."), *aff'd in part and vacated in part on other grounds*, 836 F.2d 561 (D.C.Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 2034, 100 L.Ed.2d 619 (1988).

■ There is authority for the defendants' position that one must be an officer of the United States to conduct litigation on its behalf. For example, in *Buckley v. Valeo*, the Supreme Court held that the Federal Election Commission could not engage in civil law enforcement so long as Congress had a role in appointing its members. The Court stated that

these provisions of the Act, vesting in the [Federal Election] Commission primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights, violate Art. II, § 2, cl. 2, of the Constitution. Such functions may be discharged only by persons who are "Officers of the United States" within the language of that section.

424 U.S. at 140, 96 S.Ct. at 692. However, *Buckley v. Valeo* was the product of the Court's concern that Congress not encroach on executive branch functions. The Commission was a standing body with the authority to enforce the federal elections laws. Its members were appointed by Congress, served for a specified tenure, and drew a federal salary. The Court noted that Congress, under the Appointments

Clause, cannot enact legislation that empowers it to " 'enforce [the laws] or appoint the agents charged with the duty of such enforcement.' " *Id.* at 139, 96 S.Ct. at 691, *citing Springer v. Philippine Islands,* 277 U.S. at 202, 48 S.Ct. at 482.

The provisions of the Federal Election Campaign Act addressed in *Buckley v. Valeo* are entirely different from the False Claims Act amendments at issue here. Unlike the members of the Federal Elections Commission, the relator is not appointed by Congress, receives no federal salary and serves for no specified term. Furthermore, the *qui tam* plaintiff is not vested with the "primary responsibility" to enforce the False Claims Act on behalf of the United States, but instead, is involved in an individual case. Finally, the relator is not charged by Congress with setting the false claims policy of the United States, but merely is given a right to sue—a right that can be limited in all substantive respects by the executive branch.

The broad reading of *Buckley v. Valeo* that the defendants propose would result in the implicit overruling of all *qui tam* and private attorneys general statutes. It is beyond dispute that the Supreme Court would not engage in such a sweeping revision of federal legislation without expressly stating so. This Court believes that *Buckley v. Valeo* is more reasonably interpreted as preventing Congress from attempting to enforce federal law.

*Buckley v. Valeo* has been limited in this manner by courts confronting the issue of private citizen enforcement of public laws. The case "does not stand for the proposition, as defendants would have this Court believe, that private persons may not enforce any federal laws simply because they are not Officers of the United States appointed in accordance with Article II of the Constitution." *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 652 F.Supp. 620, 624 (D.Md.1987); *see also NRDC v. Outboard Marine Corp.,* 692 F.Supp. 801, 816 (N.D.Ill.1988) ("Despite the potentially far-reaching language employed in … *Buckley,* the role of private actors was simply not an issue the Court was called

upon to address."); *cf. Melcher v. Federal Open Market Committee,* 644 F.Supp. at 521. Thus, so long as private participation is not a subterfuge for congressional control, the executive's Article II responsibility to execute the laws faithfully is not threatened. No such claims can be raised here.

Courts have consistently recognized that Congress may authorize citizen enforcement actions if it finds that such authorization would promote effective law enforcement. The Supreme Court has stated that *qui tam* actions are created on the theory " 'that one of the least expensive and most effective means of preventing frauds on the Treasury is to make the perpetrators of them liable to actions by private persons acting … under the strong stimulus of … the hope of gain.' " *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 541 n. 5, 63 S.Ct. 379, 383 n. 5, (1943), *quoting United States v. Griswold,* 24 F. 361, 366 (D.Or. 1885); *see also Tigner v. Texas,* 310 U.S. 141, 148–49, 60 S.Ct. 879, 882–83, 84 L.Ed. 1124 (1940); *FTC v. American Nat'l. Cellular,* 810 F.2d 1511, 1516 (9th Cir.1987) (Tang, J., concurring) (citing *Hess* for the proposition that citizens can engage in enforcement of federal law); *United States ex rel. Burnette v. Driving Hawk,* 587 F.2d 23, 24 (8th Cir.1978) ("Whether a penalty may be enforced by a civil [*qui tam*] action brought by a private citizen or only by a criminal suit prosecuted by the government is a matter of legislative discretion, direction and intent….."). Even after *Buckley v. Valeo,* federal courts have consistently upheld citizen suit provisions against constitutional challenges based on the theory that the Constitution forbids enlisting private citizens to aid public law enforcement efforts. *See, e.g., NRDC v. Outboard Marine Corp.,* 692 F.Supp. at 815–17; *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 652 F.Supp. at 623–26. As discussed above, any concern that private enforcement of public rights under the False Claims Act intrudes on executive prerogative is ameliorated by the Act's provisions.

For these reasons, this Court concludes that the Appointments Clause does not raise a constitutional infirmity in the

amended *qui tam* provisions of the False Claims Act.

### IV. Standing:

■ Under 31 U.S.C.A. section 3730(b)(1), a private person may bring a false claims action "for the person and for the United States Government." The *qui tam* plaintiff sues in the name of the government. The defendants argue this congressional grant of standing exceeds the constitutionally imposed limits on justiciable controversies because the relator cannot demonstrate an injury-in-fact.

### A. Article III Requirements:

Under Article III, the jurisdiction of the federal courts is limited to "cases" and "controversies." The various doctrines of justiciability that limit the federal courts' power to adjudicate disputes—such as ripeness, mootness, and standing—arise from a concern about the separation of powers in the constitutional scheme. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Specifically, Article III doctrines "state fundamental limits on federal judicial power in our system of government." *Id.*

Standing is perhaps the most important of the doctrines of justiciability. To have standing, a plaintiff must show actual or threatened injury that is likely to be redressed if the requested relief is granted.[9] *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). This injury must be concrete and distinct, *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 220, 94 S.Ct. 2925, 2931, 41 L.Ed. 2d 706 (1974), to ensure that the litigant has a personal stake in the outcome of the litigation, *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). The purpose of this requirement is to ensure "that concrete adverseness which sharpens the presentation of issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). However, as the Supreme Court has noted, vigorous litigation "is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 486, 102 S.Ct. 752, 766, 70 L.Ed.2d 700 (1982).

Congress may create a legal interest and confer standing to assert that right. *See Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 208–09, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972); *Gonzales v. Gorsuch,* 688 F.2d 1263, 1266 (9th Cir.1982). If Congress does create statutory standing, the prudential limitations on standing—such as the requirement that the plaintiff's injury be individualized and particularized—are not considered by a reviewing court. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982). However, Congress may not confer standing on a plaintiff who cannot show the constitutional minimum of injury-in-fact.[10] *Valley Forge Christian College v. Americans United for Separation of Church and*

---

**9.** The defendants do not dispute the redressability of the injury alleged in a false claims suit. These suits are essentially actions for common law fraud, which have been "'traditionally thought to be capable of resolution through the judicial process....'" *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984), *quoting Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968).

**10.** Thus, for example, in *McClure v. Carter,* 513 F.Supp. 265 (D.Idaho 1981), *aff'd without op. sub nom. McClure v. Reagan,* 454 U.S. 1025, 102 S.Ct. 559, 70 L.Ed.2d 469 (1981), the three-judge panel of the district court struck down a statute that purported to give any member of Congress the right to challenge a judicial appointment after Senate confirmation. The statute conferred standing to bring suit even on a Senator who had voted to approve the appointment and on a House member who had no right to vote on the appointment. The court noted that a legislator's interest in maintaining the effectiveness of his vote was insufficient under this statute to confer standing. *Id.* at 270. The real vice of the statute was that it exceeded the bounds of judicial power and represented a voluntary "ceding to the federal judiciary powers and responsibilities that rightfully belong to the legislature or the executive." *Id.* at 271. Because the suit involved a political question, the court refused to inject itself into the controversy.

*State, Inc.,* 454 U.S. at 488 n. 24, 102 S.Ct. at 766 n. 24.

### B. Injury–in–Fact:

*Qui tam* statutes have survived numerous previous constitutional attacks premised on an asserted lack of standing. *See, e.g., Associated Industries of New York State, Inc. v. Ickes,* 134 F.2d 694, 704 (2d Cir.1943) ("Congress can constitutionally enact a statute conferring on any non-official person ... authority to bring suit to prevent action by an officer in violation of his statutory powers; for then, in like manner, there is an actual controversy, ... even if the sole purpose is to vindicate the public interest.") (footnote omitted), *vacated as moot,* 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943); *Public Interest Bounty Hunters v. Board of Governors,* 548 F.Supp. 157, 161 (N.D.Ga.1982) (the central purpose of *qui tam* statutes is "to provide a private citizen who would otherwise have no judicially cognizable 'interest' in rights protected by particular federal substantive provisions with an interest sufficient to give that individual standing to sue to enforce these provisions."); *Calderwood v. Mansfield,* 71 F.Supp. 480, 481 (N.D.Cal. 1947) ("Although [a lawsuit brought pursuant to a statute authorizing a *qui tam* action for marking unpatented articles] may be brought by an informer or on behalf of the United States, injury to private interest is not pertinent."). The two modern-era Supreme Court justices who shared the most restrictive view of standing, Justices Frankfurter and Harlan, found no fault with *qui tam* statutes. Even when dissenting in cases that they viewed as unwarranted expansions of the standing doctrine, these justices cited *qui tam* statutes as classic examples of constitutionally proper standing. *See Flast v. Cohen,* 392 U.S. 83, 120, 88 S.Ct. 1942, 1962, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting) (in *qui tam* actions, the courts have "repeatedly held that individual litigants, acting as private attorneys-general, may have standing at 'representatives of the public interest.'"), *quoting Scripps–Howard Radio, Inc. v. FCC,* 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942); *Priebe & Sons v. United States,* 332 U.S. 407, 418, 68 S.Ct.

123, 129, 92 L.Ed. 32 (1947) (Frankfurter, J., dissenting) (in *"qui tam* actions ... society makes individuals the representatives of the public for the purpose of enforcing a policy explicitly formulated by legislation.").

The concept that a private plaintiff may sue on behalf of the United States—in effect, suing on the injury to the United States—under the False Claims Act is not a new one. In fact, this provision has been part of the False Claims Act since its inception in 1863, *see* Act of March 2, 1863, ch. 67, 12 Stat. 696, through its first substantive amendment in 1943, *see* Pub.L. No. 213, ch. 377, 57 Stat. 608 (1943), *codified in* 31 U.S.C.A. section 3730 (West 1982), to its current restructuring, *see* Pub.L. No. 99–562, 100 Stat. 3154 (1986), *codified in* 31 U.S.C.A. section 3730 (West Supp.1988).

The Act's statutory grant of standing has been consistently validated by the federal courts. *See, e.g., United States ex rel. Marcus v. Hess,* 317 U.S. at 541, 63 S.Ct. at 383 ("Qui tam suits have been frequently permitted by legislative action, and have not been without defense by the courts."); *Marvin v. Trout,* 199 U.S. 212, 225, 26 S.Ct. 31, 34, 50 L.Ed. 157 (1905) ("Statutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by the statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government."); *United States ex rel. Woodard v. Country View Care Center,* 797 F.2d 888, 893 (10th Cir.1986) ("The statute of course eliminated any standing problem."); *United States ex rel. Joseph v. Cannon,* 642 F.2d 1373, 1376–77 (D.C.Cir. 1981) ("To encourage action against defrauders, Congress authorized private citizens to bring civil action against wrongdoers on the Government's behalf....") (footnote omitted), *cert. denied,* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 865 (1982); *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 460 (5th Cir.1977) (former version of the statute affords relator standing to bring the suit even if the United States elects not to join), *cert. denied,* 434

U.S. 1035, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *United States ex rel. U.S.–Namibia Trade & Cultural Council, Inc. v. South West Africa People's Organization,* 585 F.Supp. 632, 633 (S.D.N.Y.1984) ("Plaintiff is correct in stating that the Act confers standing on any person to bring a *qui tam* action for violations of 31 U.S.C. § 3729, *see* 31 U.S.C. § 3730(b)(1); *United States ex rel. Weinberger v. Equifax, Inc.,* 557 F.2d 456, 460 (5th Cir.1977)."); *United States ex rel. Sacks v. Philadelphia Health Management Corp.,* 519 F.Supp. 818, 820 n. 1 (E.D.Pa.1981) ("Private individuals are granted standing to bring suit on behalf of the United States under the conditions enumerated in [the Act].").

In essence, the defendants argue that the foregoing cases assume the presence of standing under the Act without engaging in thoughtful analysis of the issue. The defendants contend that the relator fails to allege a constitutionally sufficient injury-in-fact, however, because his claim involves *only* injury to the government, not to himself. They assert that alternative theories of standing cannot validate the statute, as each requires a showing of personal injury. For example, *jus tertii,* or third-party standing, requires a demonstration of actual harm. *Craig v. Boren,* 429 U.S. 190, 194, 97 S.Ct. 451, 455, 50 L.Ed.2d 397 (1977) (economic injury from discriminatory statutory scheme). Public interest standing likewise requires some showing of injury, no matter how small. *Sierra Club v. Morton,* 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972) (injury other than economic harm is judicially cognizable). Other possible theories that would support the statutory scheme have either been rejected entirely, *see Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. at 482–83, 102 S.Ct. at 763–64 (rejecting citizen standing to sue to enforce the laws absent statutory authorization), or severely limited, *see id.* (taxpayer standing applies only in Establishment Clause cases). Even private attorneys general statutes require a showing of injury. *See Middlesex County Sewerage Authority v. Nat'l. Sea Clammers Ass'n.,* 453 U.S. 1, 17, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981) (rejecting an implied right of action under the Federal Water Pollution Control Act).

The defendants, however, miss the analytical boat. There is no constitutional prohibition to the relator's suing, under a statutory grant of standing, on the injury to the United States. *See Kingsley Books, Inc. v. Brown,* 354 U.S. at 441, 77 S.Ct. at 1327; *United States ex rel. Marcus v. Hess,* 317 U.S. at 541, 63 S.Ct. at 383; 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531.13, at 76 (1984) ("if Congress wishes, indeed, it can enact a *qui tam* statute to enable a private party to invoke the standing of the government to collect a civil penalty."). The False Claims Act essentially creates, by legislative fiat, a *de facto* assignment of a portion of the government's interest in the action. At this level of the analysis, the standing question tends to merge with the separation of powers issue.

To the extent that the plaintiff must have a personal stake in the outcome of the litigation to succeed on traditional standing theories, there are several possible approaches. First, arguably the statute provides him one by virtue of the statutory bounty. Under the False Claims Act, the relator receives 25 to 30 percent of the amount of an award or settlement if solely the relator prosecutes the action, 15 to 25 percent if the government elects to intervene, and up to 10 percent if the action is based primarily on governmental disclosures of information. 31 U.S.C.A. section 3730(d)(1)–(2). As a result of this bounty provision, relators are treated as real parties in interest under Fed.R.Civ.P. 17. The district court in *Public Interest Bounty Hunters v. Board of Governors* believed the reward was enough to create an injury-in-fact.

The *qui tam* plaintiff thus becomes a "person aggrieved" by defendants' purported behavior who has suffered "injury" of the constitutional magnitude required to confer upon him a claim against the defendants. *Qui tam* plaintiffs therefore stand in the position of

"private attorneys general" whom Congress has "deputized" to enforce federal laws.

548 F.Supp. at 161. The defendants dispute the contention that Congress may create an injury-in-fact by establishing a statutory reward, noting that in cases like *Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), the Supreme Court has ruled that an award of attorney's fees against a defendant-intervenor does not create a judicially cognizable interest sufficient to allow a private person to defend a criminal statute. In that case, however, the Court noted that the fee award was wholly collateral to the subject matter of the litigation. *Id.* 476 U.S. at 70, 106 S.Ct. at 1708. In this case, by contrast, the bounty is inextricably intertwined with the underlying lawsuit. The award creates a concrete, identifiable interest that falls within the confines of Article III.

Even if the bounty provision were insufficient to create a personal stake in the litigation, other factors counsel a finding that *qui tam* plaintiffs can demonstrate an actual or threatened injury-in-fact. In most cases, such as the one at bar, the relator will have access to the information forming the basis of the complaint only through an employment relationship. Public disclosure of the filing of the complaint, in spite of the rights provided by 31 U.S.C. A. section 3730(h), will often result in termination of that relationship or in a compromised opportunity for future advancement. In addition, reporting the information to the government may result in a suspension of a governmental procurement program, as has happened recently, thus jeopardizing the relator's continued employment. Furthermore, the disclosure of the discovery of the alleged fraud to a superior or the government may create difficulty in finding future employment in the same industry. In this case, prior to reporting information to the Department of Defense via its fraud hotline, the relator alleges that he presented it to one of his superiors. Rather than congratulating the relator for his conscientiousness, the superior allegedly threatened to have him "blackballed" in the entire defense contracting industry if he pursued his inquiries. Finally, to the extent the relator is a knowing participant in the fraud and fails to act on it, he may be liable in a False Claims Act prosecution. Without the remedy of a *qui tam* suit, the relator faces a Hobson's choice of participating and facing future liability, or exiting quietly from the offending company and forfeiting his seniority and job security.

Thus, even if Congress has exceeded its constitutional authority by creating a blanket grant of standing to *qui tam* plaintiffs, a view that this Court by no means espouses, the *qui tam* plaintiff in this case has a sufficient personal stake in the outcome of the litigation to have standing to pursue this action.

## CONCLUSION:

It is this Court's conclusion that the 1986 amendments to the False Claims Act must survive the defendants' constitutional challenges.[11] For this reason, the defendants' motions to dismiss are hereby DENIED.

IT IS SO ORDERED.

---

11. As noted above, this Court passes only on the constitutionality of the amended False Claims Act. Once this Court has passed on the constitutionality of the statute, the particular policy pursued by Congress is solely a matter of legislative discretion. As the Supreme Court stated in *United States ex rel. Marcus v. Hess,* 317 U.S. at 547, 63 S.Ct. at 385,

It is said that effective law enforcement requires that control of litigation be left to the Attorney General; that divided control is against the public interest; that the Attorney General might believe that war interests would be injured by filing suits such as this; that permission to outsiders to sue might bring unseemly races for the opportunity of profiting from the government's investigations; and finally that conditions have changed since the Act was passed in 1863. But the trouble with these arguments is that they are addressed to the wrong forum.

(footnote omitted).