UNITED STATES of America, ex rel.
KREINDLER & KREINDLER,
Plaintiff,

v.

UNITED TECHNOLOGIES
CORPORATION,
Defendant.

No. 87–CV–1626.

United States District Court,
N.D. New York.

Nov. 14, 1991.

Kreindler & Kreindler, New York City (David Beekman, of counsel), Washington, D.C. (Patrick Lee, of counsel), for plaintiff.

Claire M. Sylvia, Asst. Counsel, U.S. Senate, Office of Senate Legal Counsel, Robert Michael Long, Asst. Counsel, Washington, D.C., amicus curiae.

Charles Teefer, Asst. Counsel, U.S. House of Representatives, DeGraff Foy Conway Holt–Harris & Mealey, Albany, N.Y. (Christopher Massaroni, of counsel), Crowell & Moring, Washington, D.C., for defendant.

## MEMORANDUM–DECISION AND ORDER

McCURN, Chief Judge.

### I. *Introduction*

The plaintiff, Kreindler & Kreindler, known as the "relator" in this type of *qui tam* proceeding, is a law firm which has filed fraud claims against the defendant, United Technologies Corp. ("UTC"), pursuant to the provisions of the False Claims Act, particularly 31 U.S.C. §§ 3729 and 3730. The relator claims that defendant UTC concealed a design defect in the rotors of helicopters it sold to the U.S. Army. The defendant has filed four separate motions—two motions to dismiss and two motions for summary judgment. The defendant moves to dismiss on the grounds that the portions of the False Claims Act which permit relator to sue on behalf of the United States government are unconstitutional inasmuch as they violate the separation of powers doctrine and the Appointments Clause of the U.S. Constitution, and because relator does not have standing to bring the claims. Defendant also moves to dismiss for lack of subject matter jurisdiction because the relator is not an "original source" of the information upon which its claims are based, as required by 31 U.S.C. § 3730(e)(4)(A). Defendant moves for summary judgment, contending that relator's claims are barred by the applicable statute

of limitations, and that relator is prohibited from using most of the evidence on which it bases its claims by a settlement agreement and protective order involving the same two parties in a previous wrongful death action.

## II. *Background*

The relator, Kreindler & Kreindler, represented Audrey Bryant, the wife of U.S. Army Warrant Officer Charles Edward Bryant, in a wrongful death action brought in this court as a result of Mr. Bryant's death on August 5, 1982, in the crash of an Army helicopter manufactured by the defendant UTC. That litigation was terminated by a settlement agreement entered into by Mrs. Bryant and Sikorsky Aircraft, a division of UTC, on July 21, 1987. The parties had also previously entered into a stipulation and protective order, dated November 21, 1984, which provided that "the documents, data, information and other materials provided by [UTC] in the defense of this action and/or pursuant to plaintiff's pretrial discovery requests ... shall be used by plaintiff solely for the purposes of this action." The settlement agreement stated: "As a condition to this Agreement, Mrs. Bryant and her attorneys expressly agree to [return the documents and materials and] ... to honor all other terms and conditions of the Stipulation and Protective Order." The settlement agreement stated further that it was "binding upon Mrs. Bryant and United Technologies Corporation and their respective ... attorneys...." The settlement agreement was signed by Mrs. Bryant, representatives from UTC, and Francis Fleming, an attorney for Kreindler & Kreindler.

As relator states in the complaint, its claims in the present action are based on information obtained from UTC in discovery in the previous action, *Bryant v. United Technologies Corp.* Complaint, para. 2, 5. The relator claims that UTC was awarded a contract by the United States government to provide the Army with several hundred UH–60A "Black Hawk" helicopters. One of the features required by the contract was the ability to fold the rotor blades of the helicopters so they could be transported in Army transport planes. Relator claims that in late 1977 or early 1978, UTC discovered that its design to incorporate this feature, in which "blade fold pins" were to be inserted into the "flight control assembly system" to eliminate pressure on the flight control system, was defective in that the prefabricated holes into which the pins were to be inserted did not line up. This aspect of the design proposal has never been corrected by UTC, relator asserts, although approximately 690 Black Hawk helicopters have been delivered by UTC to the Army. Relator alleges that UTC secretly revised its design rather than refabricate the affected components so that the pins could be inserted. Relator alleges that UTC made its design change, which consisted of changing the type of bearing used in the flight control assembly system, without advising the United States that the change was being made or obtaining required approval for the change. Relator also claims that UTC failed to advise the United States that a hazard had been created by the abandonment of the blade fold pin design, and that UTC knew of the hazard. Relator claims that UTC changed the procedure by which rotor blades could be folded, calling for pitch control rods to be disconnected, although this change in procedure would make it impossible for the blade folding process to be completed in the time limits specified in the Army production contract. UTC later informed the Army of an alternative process which entailed inserting a block of wood into the rotor assembly to relieve pressure on the rotor system during the blade folding process. These failures to meet the required specifications and failure to inform the United States about the safety hazard constitute a fraud on the government, relator asserts. In addition, the relator claims, the design defect resulted in the crash of five Black Hawk helicopters between the years of 1982 and 1987.

## III. *Discussion*

The relator brings this *qui tam* [1] action on behalf of the United States pursuant to

---

1. The connotation *"qui tam"* is derived from the Latin phrase *"qui tam pro domino rege quam*

provisions of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*[2] The False Claims Act was originally enacted in 1863 during the Lincoln Administration, and has been amended twice, in 1943 and 1986. Under all versions of the Act, individuals have been authorized to "bring a civil action for a violation of [the Act] for the person and for the United States Government." 31 U.S.C. § 3730(b)(1).

Briefly, the statute as now amended specifies the following procedure with respect to *qui tam* actions: The relator must file his complaint *in camera* where it remains under seal for at least 60 days to allow the government sufficient time to decide whether to enter the action. 31 U.S.C. § 3730(b)(2). If the government decides not to join the action—as it did in the instant case—the action will proceed in its behalf at the direction of the relator. 31 U.S.C. 3730(c)(3). The government may, however, intervene at a later date upon a showing of "good cause." 31 U.S.C. § 3730(c)(3).

If the government does intervene, it assumes primary responsibility for the prosecution of the case, "and shall not be bound by an act of the person bringing the action." 31 U.S.C. § 3730(c)(1). The relator remains as a party to the action, however, and his participation may be limited only by order of the court. 31 U.S.C. § 3730(c)(2)(C)–(D).

Whether or not the government joins the suit, the *qui tam* relator is entitled to a portion of the proceeds if the prosecution is successful. If the government participates, the relator will receive no less than 15 percent and no more than 25 percent of the recovery. 31 U.S.C. § 3730(d)(1). If

the government does not join in the action, recovery is set at 25 percent to 30 percent. 31 U.S.C. § 3730(d)(2).

■ The question of the constitutionality of the *qui tam* provisions of the False Claims Act has been the subject of a number of recent cases in the federal courts, and of great interest to the defense contracting industry, the government, and the public. Several amicus curiae briefs were submitted to the court on the issue, and counsel representing the United States Senate and the House of Representatives presented oral argument to the court on the return date for these motions. Before reaching the question of the statute's constitutionality, however, the motions based on other grounds will be considered, since the court should not decide federal constitutional questions where a dispositive nonconstitutional ground is available. *Hagans v. Lavine*, 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974); *United States v. Leon*, 766 F.2d 77, 78 (2d Cir.1985) ("a court should not reach constitutional issues when there are other, nonconstitutional grounds upon which it can resolve the case"). Of those, the jurisdictional issues—plaintiff's standing and the applicability of the statute of limitations—will be addressed first.

### A. STANDING

■ The defendant contends that the relator does not have standing to bring this suit, since it has not suffered "some actual or threatened injury as a result of the putatively illegal conduct of the defendant." *Gladstone Realtors v. Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). Defendant also argues

---

*pro se ipso in hac parte sequitur*," which means "who brings the action for the king as well as for himself."

**2.** Section 3729 provides, in pertinent part, that: [a]ny person who ... (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim or payment for approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to

get a false or fraudulent claim paid or approved by the Government;
(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Government sustains because of the act of that person....
31 U.S.C. § 3729(a).

that Congress cannot eliminate the Constitution's standing requirement by creating a financial incentive for a plaintiff that is not the result of an injury to the plaintiff itself.

Defendant argues that the relator lacks standing because it has no "'personal stake in the outcome of the controversy' ... to ensure ... an adversarial [proceeding] capable of judicial resolution." *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972) (quoting *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). Of course, Article III of the Constitution limits federal court jurisdiction to the resolution of "cases" or "controversies," and federal courts thus lack the power to render advisory opinions, to resolve political questions, or to entertain friendly suits. *See Sierra Club,* 405 U.S. at 732 n. 3, 92 S.Ct. at 1365 n. 3.

 The standing of a *qui tam* plaintiff in a False Claims Act action has been upheld in three cases cited to the court by the plaintiff. *See United States ex rel. Truong v. Northrop Corp.,* 728 F.Supp. 615 (C.D.Cal.1989); *United States ex rel. Newsham v. Lockheed Missiles and Space Co.,* 722 F.Supp. 607 (N.D.Cal.1989); *United States ex rel. Stillwell v. Hughes Helicopters, Inc.,* 714 F.Supp. 1084 (C.D.Cal. 1989). As the court notes in *Stillwell,* Congress may create a legal interest and confer standing to assert that right. *Stillwell,* 714 F.Supp. at 1096 (citing *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 208–09, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972)). If Congress does create statutory standing, the normal requirements of standing—particularly the requirement that the plaintiff's injury be individualized and particularized—are not considered by the reviewing court. *Stillwell,* 714 F.Supp. at 1096 (citing *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372, 102 S.Ct. 1114, 1120, 71 L.Ed.2d 214 (1982)). Nevertheless, "Congress may not confer standing on a plaintiff who cannot show the constitutional minimum of injury-in-fact." *Stillwell,* 714 F.Supp. at 1096 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 488 n. 24, 102 S.Ct. 752, 766 n. 24, 70 L.Ed.2d 700 (1982)).

With respect to the injury-in-fact requirement, the courts in *Truong, Newsham* and *Stillwell* note that the various *qui tam* statutes passed by Congress have survived constitutional challenges based on purported lack of standing. In addition, "[t]here is no constitutional prohibition to the relator's suing, under a statutory grant of standing, on the injury to the United States." *Stillwell,* 714 F.Supp. at 1098. *See also Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441, 77 S.Ct. 1325, 1327, 1 L.Ed.2d 1469 (1957); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 541, 63 S.Ct. 379, 383, 87 L.Ed. 443 (1943); *see also* 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3531.13 at 76 (1984) ("if Congress wishes, indeed, it can enact a *qui tam* statute to enable a private party to invoke the standing of the government to collect a civil penalty"). The court in *Truong* found that, "[w]here there is evidence of palpable injury to the entity on whose behalf and in whose name the suit is brought, it is superfluous to require that the relator be individually aggrieved." *Truong,* 728 F.Supp. at 619. The *Truong, Newsham* and *Stillwell* courts thus held that Congress properly conferred standing on *qui tam* relators under the False Claims Act. *Truong,* 728 F.Supp. at 618–19; *Newsham,* 722 F.Supp. at 614–15; *Stillwell,* 714 F.Supp. at 1098–99. The court finds the reasoning in these cases persuasive.

 Some injury-in-fact to the government must be present, however. *See Truong,* 728 F.Supp. at 618; *Stillwell,* 714 F.Supp. at 1098. Here, the relator alleges that the government has been damaged by defendant's fraud in concealing its unilateral design change in the blade fold system. The government has paid for hundreds of helicopters with this concealed design flaw, plaintiffs aver. This is sufficient to confer standing on the relator. The court in *Stillwell* also recognized other possible bases for a relator's standing. First, the "statutory bounty" available under the False

Claims Act creates a personal stake in the outcome on behalf of the relator, and makes him or her a real party in interest pursuant to Fed.R.Civ.P. 17. *Id.* at 1098–99. Second, since the relator often has access to the information forming the basis of his claim only through his employment relationship, he or she faces the prospect of loss of employment and benefits if the fraud is disclosed. *Id.* at 1099. Finally, to the extent the relator is a knowing participant in the fraud and fails to act on it, he or she may be liable in a False Claims Act prosecution. *Id.* Although the second and third reasons are not applicable to the relator here, since it was not an employee of the defendant, the statutory bounty creates an additional basis for relator's standing.

## B. STATUTE OF LIMITATIONS

Defendant moves for summary judgment on the ground that the statute of limitations has run on relator's claim. The applicable limitations period for a false claims action is six years from the date of the violation of the False Claims Act, or three years from the date that the government knew or should have known of the violation. The Act provides:

A civil action under section 3730 may not be brought—

(1) more than 6 years after the date on which the violation of section 3729 is committed, or

(2) more than 3 years after the date when facts material to the right of action are known or reasonably known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last.

31 U.S.C. § 3731(b) (1986).

The six-year limitations period begins to run "on the date the claim is made or, if the claim is paid, on the date of the payment." *Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 829 (S.D.N.Y.1986), *aff'd,* 817 F.2d 1007 (2d Cir. 1987). As the statute states, the three-year limitations period begins to run from the date "when facts material to the right of action are known or reasonably should have been known" by the government official responsible for such information.

■ UTC maintains that the relator's fraud claims can, at most, extend to the first 115 Black Hawk helicopters delivered by UTC, since those were the only aircraft delivered with the faulty Fafnir bearing design. UTC contends it ceased using the Fafnir bearing in 1980, and that in 1979 the Army was aware of this design problem and informed its personnel that they must disconnect the pitch control rods before folding the rotor blades. Thus, since 1979, UTC argues, the Army knew of the facts material to relator's claim, and there was no hidden defect. Consequently, the defendant contends, since the government was aware of the alleged defect in 1979, it has no claim under the False Claims Act, since an essential element is that the claim be false or fraudulent. *See Boisjoly v. Morton Thiokol, Inc.,* 706 F.Supp. 795, 808 (D.Utah 1988).

The relator apparently concedes in its responding memorandum that claims based on the first 115 helicopters are barred by the six-year statute of limitations, since the last payments on those aircraft were made in March 1981, and the complaint was filed December 30, 1987.

The relator maintains, however, that the six-year limitations period commenced upon payment for each helicopter delivered to the United States, since the fraud by defendant—concealing its unilateral abandonment of the blade fold pin design—continued unknown to the government until the commencement of this suit. Relator asserts that the government has continued to purchase Black Hawk helicopters even after the filing of the complaint in this action. Relator also seeks to toll the statute of limitations, asserting that the official with responsibility to act here did not have knowledge of the fraud. The relator contends that the defendant has failed to sustain its initial burden of showing the absence of material issues of fact as to which government official was responsible for the information in this case, when the govern-

ment had knowledge of the facts constituting the alleged fraud, the nature of the fraudulent claim, and the date the defendant presented claims for payment with knowledge or reckless disregard of the facts constituting fraud. *See Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ Relator also claims that it has not had, or was prevented from conducting, adequate discovery in the case so as to develop these factual issues. The granting of a motion for summary judgment assumes that the parties have had ample opportunity for discovery. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 n. 5, 106 S.Ct. 2505, 2511 n. 5, 91 L.Ed.2d 202 (1986). However, the nonmoving party need not be given the opportunity to complete discovery if it already has had adequate opportunity for discovery and has not taken advantage of it. *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506 (2d Cir.1989).

In *Boisjoly v. Morton Thiokol, Inc.*, 706 F.Supp. 795 (D.Utah 1988), the court considered, among other causes of action, a *qui tam* claim under the False Claims Act brought by an employee of Morton Thiokol, Inc. ("Morton Thiokol"), the manufacturer of the seal blamed for the 1986 Space Shuttle Challenger explosion. The relator alleged that defects in the seals that could result in accidents were known to Morton Thiokol and to the government, and that during the period Morton Thiokol sold the seals to the National Aeronautics and Space Administration ("NASA"), Morton Thiokol "made false claims for payments knowing that the [seals] did not meet contract specifications." *Id.* at 809.

The court found that the allegations in relator's complaint that the government knew of the defects in the seals negated his False Claims Act claim. The court observed that other courts have disallowed False Claims Act claims where the government knew, or was in possession at the time of the claim, of the facts that make the claim false. *Id.* (citing *United States v. Fox Lake State Bank*, 366 F.2d 962, 965 (7th Cir.1966); *Woodbury v. United States*,

232 F.Supp. 49, 54–55 (D.Or.1964); *United States v. Schmidt*, 204 F.Supp. 540 (D.Wis. 1962)). The court stated that "[o]nly if the government gets something less than or different from that which it expected can it be said to have suffered the kind of injury necessary to invoke FCA liability." *Id.* The court held that the relator failed to state a claim under the False Claims Act because it alleged that "the government knew of those very facts or characteristics which allegedly make the claim false...." *Id.* at 810. Further, the court rejected the relator's claim that Morton Thiokol's request for an incentive award under its contract terms with NASA was fraudulent because of Morton Thiokol's "failure to adhere to contract requirements." *Id.* at 811. This claim was likewise negated by allegations that the government knew of the alleged defect. *Id.*

The defendant submits a number of affidavits in support of its contention that the Army had knowledge of the defect on which relator's claim was based. Harold G. Heiney, who was design manager in charge of flight controls on the Black Hawk helicopter during the development stage from 1974 to 1981, refers to a number of Army documents attached to his affidavit which indicate that the Army was aware, in 1979, that if pitch control rods were not disconnected, limiter bearings could be damaged. Affidavit of Harold G. Heiney, 10/11/89 ("Heiney Affidavit"), ¶ 2–3; Exhibits 1–2. The Army revised the technical manual provisions for the blade folding operations on the Black Hawk as of May 9, 1980, requiring disconnection of the pitch control rods. Heiney Affidavit, ¶ 4; Exhibit 3. On November 6, 1979, defendant initiated an "Engineering Change Notice" with the Army to change the Fafnir limiter bearing to a solid roller, since the Fafnir bearing could develop cracks. The Engineering Change Notice was signed by the Naval Plant Representative Office ("NAVPRO") representative at defendant's manufacturing plant. Heiney states the signature of the NAVPRO representative is the government's approval for the Engineering Change Notice. Heiney Affidavit, ¶ 5–6; Exhibits 4–5.

William E. Gallagher, project manager of special projects at Sikorsky Aircraft, the division of UTC which developed and manufactured the Black Hawk, was involved in the development and testing of the blade folding equipment on the Black Hawk. Gallagher states that blade fold pins, which the relator contends were the element in the rotor design unilaterally eliminated by the defendant, were not used in the prototype Black Hawk tested and evaluated by the Army in 1976. Affidavit of William E. Gallagher, 10/3/89 ("Gallagher Affidavit"), ¶ 6. Nor were blade fold pins referred to or employed in the technical manual for the prototype helicopter submitted to the Army; in the production contract for the Black Hawk; or the equipment in the Air Transportability Kit provided by defendant to the Army as part of the contract. Gallagher Affidavit, ¶ 7–10. The technical manual which details the procedures for blade folding on the production helicopter did not prescribe or mention blade fold pins. Gallagher Affidavit, ¶ 13; Exhibit 6. A pin originally used as a blade fold pin in early prototype models of the Black Hawk was, after 1975, used only as a "rigging pin" for the rigging of controls, and was unrelated to blade folding. Gallagher Affidavit, ¶ 12; Exhibit 5.

The Army conducted tests on the Black Hawk at Fort Campbell, Kentucky on July 11 and July 25, 1979, and addressed, among other questions:

Can the Black Hawk aircraft be loaded on a C–141/C–5A aircraft in specified quantities and times according to technical manual (TM 55–1520–237–23–4) with organic tools?

The Army's report on these tests, according to Gallagher, shows that the Army had knowledge of the equipment and procedures used in blade folding, and it did not involve the use of blade fold pins. Gallagher Affidavit, ¶ 14; Exhibit 7. Between November 12–18, 1979, the Army conducted a transport exercise, which was attended by United Technologies representatives. During this exercise, the Army and UTC learned that the Fafnir limiter bearing could crack if pitch control rods were not disconnected during the blade folding procedure. Gallagher Affidavit, ¶ 15–16.

Robert E. Hall was chief of the Airframe Branch of the Technical Management Division of the U.S. Army Black Hawk Project Manager's Office from 1975 to 1981. The Project Manager's Office, an arm of the Army Aviation Systems Command ("AVSCOM"), was responsible for supervision of the "technical configuration" of the Black Hawk helicopter in all respects except the engine. Affidavit of Robert E. Hall, 5/24/90 ("Hall Affidavit"), ¶ 1. Hall states that he was the highest level official at the Project Manager's Office directly involved with management and supervision of Black Hawk air transportability issues, "including such issues as the compliance of blade fold procedures with Army requirements and all components and equipment used, or proposed by Sikorsky to be used, in blade fold." Hall Affidavit, ¶ 1.

Hall states he was aware, in his capacity as chief of the Airframe Branch, and the most senior official in the Project Manager's Office, that:

during the Black Hawk prototype phase ... Sikorsky was considering use of a blade fold pin, in the Black Hawk prototype helicopter, to block blade fold loads out of the mixer assembly. I was also aware during the Black Hawk prototype phase of the operational difficulties inherent in the blade fold pin procedure, specifically that it was difficult to align certain components so that the holes into which the blade fold pins would fit would line up properly....

Sikorsky eventually abandoned the blade fold pin concept. Although I do not remember the precise date when that occurred, I was specifically aware, in my capacity as Chief of the Airframe Branch, of Sikorsky's discarding of the blade fold pin concept, and Sikorsky's reason for doing so, by December 1979 at the latest. Sikorsky did not "secretly" abandon the blade fold pin concept; *the U.S. Army Project Manager's Office understood by December 1979 at the latest (1) that the blade fold pin concept was problematic, (2) that it had been discarded by Sikorsky, and (3) the reason*

*it had been discarded by Sikorsky (namely, the alignment difficulty).*

Hall Affidavit, ¶ 2–3 (emphasis added).

Charles Musgrave was chief of the AVSCOM Technical Management Division in the Project Manager's Office from 1969 to 1985. According to Musgrave, AVSCOM is responsible for development, source selection, airworthiness qualification, and acceptance of aircraft procured by the Army, including the Black Hawk. The Black Hawk Project Manager's Office has had the responsibility for insuring that the Black Hawk was acceptable to the Army and acting upon information relating to defects in or the safety of the aircraft. Affidavit of Charles Musgrave, 5/24/90 ("Musgrave Affidavit"), ¶ 1. In 1975, during the prototype phase of development of the Black Hawk, Sikorsky decided to raise the rotor head on the helicopter to diminish vibration to the "airframe." This design change made the Black Hawk too tall to fit into the C–141 and C–130 transport aircraft, so the rotor head had to be lowered for transport. The pitch control rods had to be disconnected to lower the rotor head. Musgrave Affidavit, ¶ 2. In December 1979, Musgrave was informed that a problem was discovered when loading the helicopter into the C–5 transport aircraft, which was large enough that the rotor head did not have to be lowered. If the rotor blades were folded without disconnecting the pitch control rods, there was a possibility of damage to the bearing in the mixer assembly. Correspondence identifying the problem was circulated by the Commander of Army Aviation Research and Development Command to all field units using the Black Hawk on December 7, 1979. Musgrave Affidavit, ¶ 4; Exhibit 1.[3]

The relator's claim is based on its contention that defendant, "unilaterally and without government approval, removed an approved design feature on the first production Blackhawk aircraft for its own convenience and then repeated that change on each subsequent aircraft. The change involved the abandonment of the use of circular blade fold pins for blade fold loads because the receptacle holes into which these pins were supposed to be inserted would not line up correctly. Yet Sikorsky falsely claimed and received payment for allegedly fully complying helicopters." Affidavit of Francis G. Fleming, 3/26/90 ("Fleming Affidavit"), ¶ 2. The relator refers the court to a number of documents and deposition testimony it contends contradict some of defendant's contentions, and demonstrate that factual questions exist as to the government's knowledge of the alleged defect.

Relator cites deposition testimony by Heiney; Rudolph Huber, a UTC production manager; Luther Folks, a UTC engineer; and George Karas, a UTC employee, which appear to contradict the assertions by Gallagher that the design, prototype model and initial production model Black Hawk's did not use a blade fold pin. Affidavit of Milton G. Sincoff, 5/17/90 ("Sincoff Affidavit"), ¶ 3–11; Exhibits 5–8. Relator also submits the deposition of Ralph Lightfoot, a former chief engineer for Sikorsky, who states that the original Black Hawk design was to incorporate blade folding without disconnection of any part of the flight control system through the insertion of pins into the control system during blade folding. Affidavit of Ralph Butterworth Lightfoot, 12/15/86 ("Lightfoot Affidavit"), ¶ 13. However, Sikorsky discovered when the first Black Hawk came off the assembly line that the holes designed to accommodate these pins did not line up. Sikorsky then unilaterally abandoned the design concept, rather than attempt to resolve the problem. Lightfoot Affidavit, ¶ 14.

Relator also asserts that defendant did not adequately inform the government of the need for a design change. In fact, the relator claims, the defendant intentionally circumvented the proper Army channels by

---

**3.** The relator challenges the use by the defendant of the Hall and Musgrave affidavits, contending that they were improperly obtained since neither individual had permission from the government to testify. The court is persuaded, however, by the arguments submitted by defendant in its memorandum on this issue that the affidavits were properly obtained and may be considered by the court.

categorizing its change in the limiter bearings as a "Class II" rather than a "Class I" design change. Sincoff Affidavit, ¶ 15. According to the relator, the defendant was required by Army regulation DOD–STD–480A to notify the government when it discovered the defect in the blade fold pin system of the need for a design change. Sincoff Affidavit, ¶ 15; Exhibit 10. These notifications are to be classified as Class I, which relate to changes which affect function or safety, or Class II, which are less significant engineering changes. *See generally* Sincoff Affidavit, ¶ 15–26. The defendant submitted a Class II Engineering Change Notice in November 1979 notifying the Army of the change from the Fafnir bearing to a roller bearing. By doing so, the relator maintains, the defendant intentionally caused the change to be routed to lower level Army officials instead of higher officials who should be notified of major design changes. Sincoff Affidavit, ¶ 29–34. This allowed defendant to continue to deliver Black Hawks to the Army without revealing the blade fold pin defect, which would have been costly for defendant to redesign and correct. Sincoff Affidavit, ¶ 38–39.

The submissions on record demonstrate that the original plans for the Black Hawk were to incorporate a blade fold pin, and the Army was aware of this. *See, e.g.,* Plaintiff's Exhibits in Opposition to Defendant's Motion Regarding the Statute of Limitations, Exhibit 4 (Sikorsky's response to Army request for clarification of inspection requirements for folding blades includes reference pins). It is unclear from the documents whether the prototype model Black Hawk or the production model Black Hawk originally used blade fold pins. However, by 1979, the Army Black Hawk Project Manager's Office, responsible for the supervision and management of the entire Black Hawk program, including insuring that the Black Hawk was acceptable to the Army and acting upon information relating to defects, was aware: (1) that during the prototype phase Sikorsky was considering use of blade fold pins; (2) that Sikorsky's original design incorporating blade fold pins was problematic because the blade fold pins would not fit into the production helicopter; and (3) that Sikorsky abandoned the blade fold pin concept. The Army had all of this knowledge by December 1979. *See* Hall Affidavit, ¶ 2–3. The Army became aware in 1979 that if the rotor blades were folded without disconnecting the pitch control rods, that the Fafnir limiter bearing could break, and informed all field units using the Black Hawk of this problem. *See* Musgrave Affidavit, ¶ 4.

The intentional concealment from the Army of the abandonment of the blade fold pin concept is the basis of relator's claim. However, it is clear from the record that the senior ·Army officials responsible for the Black Hawk program were aware of this problem in 1979. Even if the Hall and Musgrave affidavits are controverted, which they are not by the relator's submissions, relator itself contends that blade fold pins were part of the original Black Hawk design, that blade fold pins were referred to in documents submitted to the Army, and that defendant was required under its contract with the Army to supply Black Hawks with the blade fold pin design. However, none of the helicopters delivered to the Army had blade fold pins, a fact that was obvious to Army officials in 1979. There is no question of fact regarding the Black Hawk Project Manager's Office's knowledge of the alleged defect. Accordingly, the relator has no claim under the False Claims Act, since the government "knew of those very facts or characteristics" which allegedly made defendant's claims false. *Boisjoly,* 706 F.Supp. at 810.

▌ With respect to relator's tolling argument under section 3731(b)(2), relator contends that "the official of the United States charged with responsibility to act in the circumstances" is the contracting officer who would have received the Class I engineering change notice that should have been submitted by the defendant. Since defendant did not submit the notice, the official charged with responsibility to act in the circumstances was not aware of defendant's abandonment of the blade fold pin design, it can be presumed from relator's

argument, until relator commenced this action. The statute of limitations would thus be tolled until that time.

There is no caselaw interpreting this phrase in the statute. However, courts interpreting the analogous tolling provision at 28 U.S.C. § 2416(c)[4] have indicated that once officials who could take action recognize the essential elements of the cause of action, the statute is not tolled. *See United States v. Boeing Co., Inc.*, 845 F.2d 476, 481–82 (4th Cir.1988); *United States v. Kass*, 740 F.2d 1493, 1497–98 (11th Cir. 1984). The court in *Boeing* rejected the argument that only one Department of Defense contracting officer had responsibility to act on claims for severance pay when several other employees and managers "recognized that a problem existed." *Boeing*, 845 F.2d at 482.

The court here rejects relator's argument that the contracting officer is the only official charged with responsibility to act in the circumstances. The facts material to relator's cause of action were known in 1979 by the senior officials in charge of the Black Hawk project. Thus, those facts were known, or reasonably should have been known, by officials with the responsibility to act. Presuming, for the sake of argument, that false claims were made to the government, since the argument has been rejected by the court, the statute of limitations began to run in 1979, when payments were made for the first Black Hawks with the allegedly concealed defect. The court is not persuaded by relator's "continuing fraud" theory, i.e., that a fraudulent claim was made with the delivery of each helicopter, since the alleged defect in each helicopter was known to the government in 1979.

With respect to relator's contention that more discovery is needed to demonstrate a lack of knowledge by the government, the relator has been able to submit numerous documents and exhibits to the court on this issue. Further discovery, in the court's opinion, will not enable the relator to controvert the government's knowledge that is clearly established by the existing record.

The defendant's motion for summary judgment on statute of limitations grounds is granted. It is thus unnecessary for the court to consider the remainder of defendant's motions.

### Conclusion

Defendant's motion for summary judgment dismissing the complaint on statute of limitations grounds is granted.

IT IS SO ORDERED.

---

**4.** Section 2416(c) provides that, for the purpose of computing limitations periods in actions by the United States, the statute of limitations shall be tolled during the time in which:

facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances. . . .