**UNITED STATES of America, ex rel. Margaret A. NEWSHAM and Martin Overbeek Bloem, Plaintiffs,**

v.

**LOCKHEED MISSILES AND SPACE COMPANY, INC., Defendant.**

No. C 88–20009 RPA.

United States District Court, N.D. California.

July 10, 1989.

Guy T. Saperstein, Saperstein & Seligman, Oakland, Cal., Michael F. Hertz and Vincent B. Terlep, Jr., U.S. Dept. of Justice, Washington, D.C., and James M. Spears, Acting Asst. Atty. Gen., and William F. Murphy, Asst. U.S. Atty., San Jose, Cal., for plaintiffs.

James J. Gallagher, Charles Pereyra–Suarez and John G. Stafford, Jr., McKenna, Conner & Cuneo, Los Angeles, Cal., and B. Scott Silverman and Paula S. Downey, Morrison & Foerster, Palo Alto, Cal., for defendant.

## OPINION FOR PUBLICATION OF ORDER DENYING MOTION TO DISMISS QUI TAM ACTION AS UNCONSTITUTIONAL *

AGUILAR, District Judge.

### I. INTRODUCTION

Lockheed Missiles and Space Company, Inc. (Lockheed) moves to dismiss this *qui tam* action as unconstitutional under Article II and Article III of the U.S. Constitution. Specifically, under Article II, defendant argues that the *qui tam* provisions of the False Claims Act violate the doctrine of separation of powers by improperly delegating prosecutorial functions to private citizens and the Judicial Branch. In addition, the provisions allegedly violate the Appointments clause by appointing private prosecutors who are allowed to act inconsistently with the government's official prosecutors. Finally, the *qui tam* plaintiffs allegedly lack standing under the case or controversy requirement of Article III of the Constitution.

The Court has received, read and considered all the papers submitted on defendant's motion.[1] In addition, the Court heard the oral argument of counsel. Good cause appearing therefor, the Court HERE-

---

\* This Order was originally filed on June 12, 1989.

**1.** In addition to plaintiffs' opposition to the motion, the Court has received *amicus curiae* briefs from the U.S. Senate and the Center for Law in the Public Interest and Taxpayers Against Fraud in support of the constitutionality of the False Claims Act. The Court also received an *amicus curiae* brief from the Chamber of Commerce in support of the motion to dismiss.

BY DENIES the motion. The *qui tam* provisions of the False Claims Act are constitutional.

## II.  FACTUAL BACKGROUND

### A.  *Qui tam pro domino rege quam pro se ipso in hac parte sequitur*

In the words of Justice Peckham, "[s]tatutes providing for actions by a common informer, who himself had no interest whatever in the controversy other than that given by statute, have been in existence for hundreds of years in England, and in this country ever since the foundation of our Government." *Marvin v. Trout*, 199 U.S. 212, 225, 26 S.Ct. 31, 34, 50 L.Ed. 157 (1905).

Following an embedded English tradition of relying on *qui tam* actions to supplement the sovereign legal enforcement mechanisms, the First Congress authorized *qui tam* suits in at least 10 of the first 14 statutes imposing penalties. *See Adams, qui tam v. Woods*, 6 U.S. (2 Cranch) 336, 341, 2 L.Ed. 297 (1805) ("[a]lmost every fine or forfeiture under a penal statute, may be recovered by an action of debt [*qui tam*] as well as by information [by the public prosecutor]").

Subsequent Congresses continued this pattern, periodically passing new *qui tam* legislation throughout the Nineteenth Century.  A succession of Presidents manifested concurrence in the *qui tam* practice by signing the legislation into law.

### B.  *The False Claims Act*

The Civil False Claims Act was born in 1863 to a nation engulfed in a civil war. The War Department found itself at the hands of unscrupulous and corrupt government contractors.  The abuses and damage done to the federal treasury and war effort was, for defense contractors, an opportunity for windfall profit.  The contractors were fast becoming "proverbially and notoriously rich."  1 F. Shannon, *The Organization and Administration of the Union Army, 1861–1865*, at 54–56 (1965) (quoting Tomes, *Fortunes of War*, 29 Harper's Monthly Mag. 228 (1864)).  "For sugar it [the government] often got sand;  for coffee, rye;  for leather, something no better than brown paper;  for sound horses and mules, spavined beasts and dying donkeys;  and for serviceable muskets and pistols, the experimental failures of sanguine inventors, or the refuse of shops and foreign armories" *Id.* at 58, Tomes, *Fortunes of War*, 29 Harper's Monthly Mag. 228 (1864).[2]

Based on the record of widespread fraud by contractors, Congress, at the urging of President Lincoln, enacted the False Claims Act.  Act of March 2, 1863, ch. 67, 12 Stat. 696.  The Act authorized suits to recover the forfeitures and damages to "be brought and carried on by any person, as well for himself as for the United States;  the same shall be at the sole cost and charge of such person, and shall be in the name of the United States." *Id.*, § 4, 12 Stat. 698.

The sponsor explained that the availability of *qui tam* actions would "hold out to a confederate a strong temptation to betray his coconspirator, and bring him to justice....  I have based ... [the bill] upon the old-fashioned idea of holding out a temptation, and 'setting a rogue to catch a rogue,'..."  Cong. Globe, 37th Cong., 3d Sess. 955–56 (1863) (remarks of Sen. Howard).

The False Claims Act was amended in 1943 to preclude parasitic suits brought upon information already in the Government's possession.[3]  After codification in 1982, the Act was again amended in 1986.[4]

---

**2.**  Some of the documented abuses ring familiar to modern day critics of defense contractors. The manufacturers of Colt's revolvers had been receiving $25 for a revolver that would ordinarily sell in the open market for $14.50.

**3.**  "Parasitic" suits were often brought based solely on public or quasi public information obtained from criminal indictments.  After a criminal indictment came out, there was a rush to the Courthouse to file a civil suit and recover the *qui tam* bounty.

**4.**  One of the goals of the 1986 Amendments was to encourage potential relators to come forward with information of fraudulent misconduct by removing the statutory bar to *qui tam* plaintiffs who gave information to the Government prior

Although the Act is codified at 31 U.S.C. § 3730, *et seq.*, it is interesting to compare the parties' descriptions of its provisions. Defendant notes that the amended FCA (1) allows the relator to initiate a suit without concurrence of the United States; (2) permits the relator to continue to prosecute a case even after the United States elects not to participate, as the government has done here; (3) conditions the ability of the United States to intervene after the earliest stage of the litigation upon court approval; and (4) allows the relator and the court to interfere with decisions by the United States to settle or dismiss an action.

Plaintiffs describe the 1986 Amendments as a careful balance, reflecting the legitimate concerns and preeminent role of the Department of Justice (DOJ) as the government's principal agent against fraud, on the one hand, and the desire to strengthen the contribution of the *qui tam* provisions to expose government fraud, on the other.

The Amendments require that *qui tam* actions be filed under seal for the initial sixty-day period, and for any extensions "for good cause shown," for the Government to determine whether to appear. If the government elects to intervene, the DOJ has primary responsibility for prosecuting the action, although the relator may continue as a party subject to restrictions.

The DOJ may dismiss or settle the action, notwithstanding the objections of the relator, upon notice and court approval. The DOJ may also seek a court order restricting a relator's participation in an action. Additionally, the DOJ may move to stay a *qui tam* plaintiff's discovery if it "would interfere with the Government's investigation or prosecution of a criminal or civil matter arising out of the same facts." § 3730(c)(4).

In the case before the Court, the DOJ sought several extensions of time. A year after the complaint was filed, the government opted not to intervene in the matter. The government is not required to give a reason for its decision, and in this case it did not explain its decision. Whether the government's decision reflects a belief that plaintiffs' claim lacks merit, as defendant asserts, or reflects the government's belief that plaintiffs and their attorneys can adequately represent the government's interest, as plaintiffs assert, is pure speculation.

### III. DISCUSSION

Defendant asks the Court to invalidate as unconstitutional the *qui tam* provisions of the False Claims Act. Defendant asserts that these provisions violate Articles II and III of the United States Constitution.

#### A. *Do the qui tam provisions violate the Separation of Powers Doctrine?*

■ Defendant argues that the *qui tam* provisions improperly place prosecutorial functions in the hands of private individuals, thereby constituting an impermissible intrusion into the functions of the Executive Branch.

Article II vests all executive power in the President and obliges the executive to faithfully execute the Laws. U.S. Const. art. II, §§ 1, 3. Although not clearly stated in the Constitution, the separation of powers doctrine flows naturally from the tripartite division of government.

Defendant asserts that the Courts have devised a two part test to determine whether the doctrine of separated powers has been violated: (1) whether the matter at issue is a function committed exclusively to one branch of Government, and (2) whether that branch has been divested of its exclusive control to accomplish its constitutionally assigned function. *Buckley v. Valeo,* 424 U.S. 1, 138, 96 S.Ct. 612, 691, 46 L.Ed.2d 659 [5]; *Immigration & Naturali-*

---

to the commencement of a suit. *See Newsham v. Lockheed,* Order Denying Motion To Dismiss (N.D.Cal. 3–29–89) The amendments also served to give a non-discretionary reward for successful suits and to protect whistleblowers from retaliation.

5. The Court notes that *Valeo,* at this cite, does not support defendant's proposed test. *Valeo* found that an electoral commission appointed by Congress violated Art. II, § 2 inasmuch as it had prosecutorial functions. The opinion, how-

*zation Service v. Chadha,* 462 U.S. 919, 944–46, 103 S.Ct. 2764, 2780–82, 77 L.Ed.2d 317 (1983).

Plaintiffs take issue with defendant's emphasis on the exclusivity of the separate branches' functions. "[A]s Madison admonished at the founding, that while our Constitution mandates that 'each of the three general departments of government [must remain] entirely free from the control or coercive influence, direct or indirect of either of the others,' the Framers did not require—and indeed rejected—the notion that the three Branches must be entirely separate and distinct." *Mistretta v. U.S.,* —— U.S. ——, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989) citations omitted.

*Mistretta* advised a flexible approach to determine whether an unconstitutional encroachment on the independence of one of the branches has occurred.[6] In addition, a statutory provision confronting a vexing national problem, approved by both Houses of Congress and signed into Law by the President should only be invalidated for the "most compelling constitutional reasons." *Mistretta,* 109 S.Ct. at 661. *Mistretta* upheld the constitutionality of the Sentencing Guidelines on the basis that the sentencing had long been peculiarly shared among the Branches of government. The Sentencing Commission did not prevent the Executive branch from accomplishing its constitutionally assigned functions.

In *Morrison v. Olson,* the Supreme Court held that the independent counsel statute did not unduly interfere with the role of the Executive Branch. 108 S.Ct. at 2620. The Court's holding was based on a finding that the Ethics in Government Act (1) was not an attempt by Congress to increase it's own powers at the expense of the Executive Branch; (2) worked no judicial usurpation of executive functions; and

(3) does not impermissibly undermine the powers of the Executive Branch. *Id.* at 2620–2622.

Following the teaching of *Mistretta* and comparing the factors supporting the constitutionality of the independent counsel statute, the Court finds that the *qui tam* statute does not violate the separation of powers doctrine.

In the present case, the *qui tam* provisions of the FCA do not increase Congress' own power at the expense of the Executive Branch: Congress (a) does not appoint the *qui tam* plaintiff; (b) does not determine whether or when the plaintiff will file suit, and (c) exercises no control whatsoever over the plaintiff's conduct in the litigation. As noted by plaintiffs, Congress' involvement with the prosecution of this lawsuit began and ended with the passage of the FCA.

The *qui tam* provisions do not usurp or undermine the powers of the Executive Branch: (a) the DOJ retains extensive control and oversight over FCA litigation, and in its discretion may intervene, dismiss or settle the action; and (b) a private plaintiff may not bring a *qui tam* suit based on the same allegations or transaction already contained in a DOJ initiated action.

Indeed, the *qui tam* provisions may be characterized as enhancing the executive's abilities to ensure that the perpetrators of fraud are brought to justice.

The parties and all the *amici* basically agree that the real question at issue here is whether the qui tam provisions afford the Executive Branch sufficient (not exclusive) control over the litigation "to ensure that the President is able to perform his constitutionally assigned duties." *Morrison v. Olson,* 108 S.Ct. at 2621–22. However, defendant and amicus curiae the Chamber of

---

ever, did not set forth a test, as defendant suggests in the placement of the cite.

**6.** The Court reviewed the various cases discussing separation of powers principles. In *Nixon v. Administrator of General Services,* 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977), the Court focussed on "the extent to which [a challenged provision of law] prevents

the Executive Branch from accomplishing its constitutionally assigned functions" *Morrison v. Olson,* —— U.S. ——, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988) and *Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986) allowed commingling of the functions of the Branches, as long as they did not pose a danger of either aggrandizement or encroachment.

Commerce believe that the *qui tam* provisions improperly surrender the executive's control to the private individual and the Court.

### 1. Will the court usurp executive functions?

As discussed in the fact section above, the DOJ may dismiss or settle a *qui tam* action with leave of court, and the DOJ may intervene late in the proceedings with leave of court and upon a showing of good cause. According to defendant, the court's role serves to infringe on the Executive's law enforcement responsibilities.

In all proceedings in the federal courts, the government, as well as any other party, must conform to various rules and statutes whereby the Court determines whether good cause has been shown, or whether a settlement is fair and equitable. In this sense, a *qui tam* action is no different than multiple other suits wherein the Court must exercise its adjudicatory function in resolving issues before it. Rather than demonstrating an encroachment into the executive's separate powers, the statute illustrates the differing roles of the judiciary and executive as contemplated by the nation's founding fathers. *See Morrison*, 108 S.Ct. at 2621 ("federal court's power to review the Attorney General's decision to remove an independent counsel ... well within the traditional power of the judiciary.").

### 2. Private Individual's Intrusion Into Executive Functions.

Defendant notes that a private relator may initiate an action, § 3730(b)(1), and proceed with the action should the Justice Department elect not to intervene. § 3730(b)(4)(B). Allegedly, once the DOJ declines at the outset to intervene, it will have lost its ability to control litigation decisions.

The Court fails to discern how a private individual's intrusion into the executive functions violates the separation of powers doctrine. There is no caselaw for the claim that the Congress may not authorize private persons to engage in conduct that might also be the province of government.[7] The United States relies upon private lawsuits as a supplement or substitute for government enforcement in a variety of contexts—antitrust, securities regulation, environmental protection, and civil rights actions all depend on private lawsuits.

Unable to refute this, defendant asserts that the motivation for the *qui tam* provisions, as amended in 1986, was to prod the DOJ to more actively prosecute fraud on the government. In this sense, defendant would portray the *qui tam* provisions as an attempt by Congress to intrude on the Executive Branch.

Once again, however, Congress, once it enacted the statute, which is its traditional function, has no control or participation in *qui tam* litigation.

The only administrative challenge to the FCA's *qui tam* provisions on the basis of separation of powers was rejected by the Supreme Court. In *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542, 63 S.Ct. 379, 383, 87 L.Ed. 443 (1942), the *qui tam* provision of the False Claims Act was challenged on the ground that "effective law enforcement requires that control of litigation be left to the Attorney General."[8] The Court dismissed the contention that *qui tam* actions might interfere with the Attorney General's responsibilities as a policy argument, "addressed to the wrong forum." 317 U.S. at 547, 63 S.Ct. at 383. Congress, not the courts, have the authority to decide whether or not to utilize a *qui tam* provision in statutes.

The Court finds that the *qui tam* provisions of the False Claims Act do not violate the separation of powers doctrine. The Attorney General retains a substantial degree of control over the *qui tam* litigation. Although the DOJ does not control the

---

7. Plaintiffs correctly note that in the public-private partnership of law enforcement, it is the involvement of the government, with a vast prosecutorial machinery that didn't exist in 1789, which is relatively new.

8. At that time, and in that case, the qui tam suit was brought based on information in an indictment already prosecuted by the Attorney General.

conception of a suit, once a suit has been filed, the DOJ has the right to conduct the litigation, dismiss the action, settle the action, or limit the intervenors' participation in the action. In this sense, the DOJ retains much greater control over the *qui tam* litigation than was found constitutional in *Morrison v. Olson*, 108 S.Ct. 2597.

### B. *The Qui Tam Provisions And The Appointments Clause of Article II.*

■ Defendant asserts that through the FCA, Congress has impermissibly appointed *qui tam* relators as "inferior officers" of the United States, giving them the executive authority to prosecute alleged violations of the Act.[9] For this proposition, defendant relies on *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, which as discussed above, invalidated the provisions of the Federal Election Campaign Act which allowed a Congressionally appointed elections commission to prosecute violations of the Act.

Although it is true that only the Executive can appoint "inferior officers" to prosecute the laws of the United States, there is no showing that Congress has actually appointed *qui tam* relators as inferior officers.

In *Auffmordt v. Hedden*, 137 U.S. 310, 327, 11 S.Ct. 103, 108, 34 L.Ed. 674 (1890), the Supreme Court held that a person whose "position is without tenure, duration, continuing emolument, or continuous duties, and [who] acts only occasionally and temporarily" is not an officer for purposes of the Appointments Clause. Unlike the appointed commissioners in *Buckley v. Valeo*, *qui tam* relators are not appointed by Congress, but have statutory authority to come forward, motivated by patriotic duty, money, or revenge to pursue a civil suit upon information of fraud within their possession. These relators do not have a tenure beyond the lifespan of the particular suit. In addition, Congress has no control over, and no power to appoint or remove, these relators.

In its reply brief, defendant's argument changed flavor somewhat and focussed on the lack of direction and control over civil suits on behalf of the United States if private individuals, and not appointed officers, are allowed to conduct the litigation. This argument must fail for the same reason as it fails with regard to the separation of powers doctrine. The DOJ retains a high degree of control over the *qui tam* suit.

The Court finds that the *qui tam* provisions do not violate the Appointments Clause of the Constitution and DENIES the motion to dismiss.

### C. *Do The Qui Tam Relators Have Standing To Pursue Their Action?*

■ Article III limits federal court jurisdiction to the resolution of actual "cases" or "controversies." Federal courts lack the power to render advisory opinions, to resolve political questions or to entertain friendly suits. *See Sierra Club v. Morton,* 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 1365 n. 3, 31 L.Ed.2d 636 (1972).

■ A necessary corollary to this justiciability principle is the requirement that a litigant have standing to challenge the action sought to be adjudicated in the lawsuit. In the absence of a specific statute authorizing "invocation of the judicial process, the question of standing depends upon whether the party has alleged such a 'personal stake in the outcome of the controversy' *Baker v. Carr*, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663], to ensure ... an adversarial [proceeding] capable of judicial resolution." *Sierra Club v. Morton,* 405 U.S. at 732, 92 S.Ct. at 1364.

■ Defendant argues that plaintiffs lack standing because they have suffered only a generalized injury common to all tax-paying citizens. Thus, defendant argues, *Valley Forge College v. Americans*

9. Congressman Berman stated the purpose of the FCA as intending to "deputize ready and able people who have knowledge of fraud against the government to play an active role through their counsel to bring to justice those contractors who overcharge the government." 132 Cong.Rec. H9388 (Oct. 7, 1986).

*United For Separation Of Church And State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1981) prohibits plaintiffs from maintaining this suit. In *Valley Forge*, the Supreme Court held that taxpayers, objecting to the conveyance of federal surplus property to a church-affiliated college, did not identify any personal injury suffered as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. *Id.* at 485, 102 S.Ct. at 765. The Court held that the plaintiffs' injury, i.e., that they would be deprived of the fair and constitutional use of their tax dollars, did not constitute actual personal injury beyond a generalized grievance common to all taxpayers. *Id.* at 487, 102 S.Ct. at 766. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,'" *Id.* at 472, 102 S.Ct. at 758, cites omitted.

*Valley Forge* is easily distinguished from the case at hand—it was a taxpayers case. The Court engaged in a detailed review of the sundry decisions holding that " 'the interests of the taxpayer in the moneys of the federal treasury are too indeterminable, remote, uncertain and indirect to furnish a basis for an appeal to the preventive powers of the Court'" *Id.* at 478, 102 S.Ct. at 761, (quoting *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952)).

In contrast, *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) noted that where Congress has authorized judicial review of an issue, the standing inquiry begins with a determination of whether the statute in question authorizes review at the behest of the plaintiff. As long as an issue is justiciable,

e.g. not a political question, Congress has the power to determine who is a proper party to a lawsuit. 405 U.S. at 732, n. 3, 92 S.Ct. at 1365, n. 3.

In addition, the United States Senate joins plaintiff in arguing that Congress authorized a *qui tam* plaintiff to sue in the name of the Government and for the United States. Although the issue of *qui tam* standing has never been directly addressed by the Supreme Court [10], several justices, while discussing different standing issues and legal authorities have reaffirmed the right of *qui tam* plaintiffs, or private attorneys general, to sue as "representatives of the public interest." *Flast v. Cohen*, 392 U.S. 83, 120, 88 S.Ct. 1942, 1963, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting) (quoting *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 14, 62 S.Ct. 875, 882, 86 L.Ed. 1229 (1942)); *See also* 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531.13 at 76 (Qui tam statutes enable a private party to invoke the standing of the government to collect a civil penalty.)

Two lower courts have affirmed *qui tam* plaintiffs' standing. *United States ex rel. Weinberger v. Equifax*, 557 F.2d 456, 460 (5th Cir.1977) (FCA clearly accords standing to a *qui tam* plaintiff); *Public Interest Bounty Hunters v. Board of Governors*, 548 F.Supp. 157 (N.D.Ga.1982) (central purpose of *qui tam* statutes and the FCA specifically is to provide standing to a private individual.) [11]

Neither of these cases analyze the justiciability concerns behind the standing requirement. However, in accord with the concerns addressed in *Valley Forge*, 454 U.S. 464, 102 S.Ct. 752, the *qui tam* statutes do present a justiciable conflict which is properly redressable by the Court. In addition, the judicial resolution of the issue will not transform the Court into a "rarified atmosphere of a debating society", nor

---

10. *Marcus v. Hess*, 317 U.S. at 541, 63 S.Ct. at 383 and *Marvin v. Trout*, 199 U.S. at 225, 26 S.Ct. at 34, implicitly ratified a *qui tam* plaintiff's standing by stating that an informer had a right to sue for recovery even though they had "no interest whatsoever in the controversy other than that given by statute".

11. The constitutionality of the *qui tam* provisions was recently affirmed in *United States ex rel. Stillwell v. Hughes Helicopters, Inc.*, 714 F.Supp. 1084 (C.D.Cal.1989).

turn the judicial process into "no more than a vehicle for the vindication of the value concerns of interested bystanders." 464 U.S. at 472–473, 102 S.Ct. at 759.

As a final argument in support of the constitutionality of the *qui tam* provisions, the United States Senate notes that the heavy reliance on *qui tam* actions by the First Congress indicates that private enforcement initiatives conformed to the Framers' original understanding of the separation of powers secured by the Constitution, as well as the Framers' concept of cases and controversies appropriate for federal court decision. *See e.g., Bowsher v. Synar,* 478 U.S. 714, 723–24, 106 S.Ct. 3181, 3186–8, 92 L.Ed.2d 583 (1986) (stating that because many members of the First Congress had taken part in framing the Constitution, that body's legislative decisions inform the meaning of the Constitution).

In the words of the *qui tam* phrase itself, "Who as well for the King as for himself sues in this matter."

The Court finds that plaintiffs have standing to prosecute this *qui tam* action. The Court HEREBY DENIES defendant's motion to dismiss the complaint.

## IV. SUMMARY

After considering the historical roots of *qui tam* provisions, the adoption of *qui tam* statutes by the earliest Congresses of the United States, and Supreme Court authority on Article II and Article III of the Constitution, the Court finds that the *Qui Tam* provisions of the False Claims Act are CONSTITUTIONAL.

The *qui tam* provisions do not violate the separation of powers doctrine. The Executive retains sufficient control over the *qui tam* litigation so as to ensure that the President is able to perform his constitutionally assigned duties. Neither does the statute violate the appointments clause of Article II. The *qui tam* plaintiffs are not inferior officers appointed by Congress. Finally, the statute grants plaintiffs standing to sue on behalf of the United States. The suit presents a justiciable conflict which comports with Article III's case and controversy requirements.

Good cause appearing therefor, the Court HEREBY DENIES the motion to dismiss.

IT IS SO ORDERED.