**UNITED STATES of America, ex rel., Rex A. ROBINSON, James Fredericks, James H. Holzrichter, and Lynn T. Austrheim, Plaintiffs,**

v.

**NORTHROP CORPORATION, Defendant.**

No. 89 C 6111.

United States District Court, N.D. Illinois, E.D.

June 16, 1993.

J. Peter Dowd, Kalman D. Resnick, Dowd & Bloch, Robert D. Allison, Ronald L. Futterman, Aram A. Hartunian, Futterman & Howard, Chtd., Joshua Karsh, Law Offices of Robert D. Allison, Chicago, IL, for plaintiffs.

Michael R. Dockterman, Lisa S. Simmons, Timothy G. Nickels, Robin L. Wolkoff, Wildman, Harrold, Allen & Dixon, Chicago, IL, for defendant.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Plaintiffs Rex Robinson (Robinson), James Fredericks (Fredericks), James Holzrichter

(Holzrichter), and Lynn Austrheim (Austrheim) worked for defendant Northrop Corporation (Northrop) at its Defense Systems Division in Rolling Meadows, Illinois. They allege that Northrop defrauded the United States government on several defense contracts. Claiming to have independent knowledge of the alleged fraud, they have sued Northrop pursuant to the *qui tam* provisions of the False Claims Act (FCA). 31 U.S.C. § 3730(b)(1). The suit is brought on behalf of both the government and the plaintiffs themselves. The government has declined to join the suit.

Before us now are defendant's motion for dismissal of plaintiffs' amended complaint pursuant to Fed.R.Civ.P. 12(b)(1), defendant's motion for dismissal of plaintiffs' complaint pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), and defendant's motion to compel production of a document that plaintiffs submitted to the government describing the alleged false claims.

## BACKGROUND

Count I of plaintiffs' amended complaint describes several allegedly false claims submitted by Northrop to the government, most relating to Northrop's roles in the production of the B–1 Bomber and the F–15 Fighter. According to Holzrichter, Northrop charged the government for scrapping parts that were not scrapped, for excess inventory, for non-conforming materials, and for parts that were scrapped accidentally and had to be reordered. According to Robinson, Northrop charged the government for labor that was not performed and for obsolete testing equipment. Fredericks claims that Northrop charged the government for brand new testing equipment after scrapping perfectly good equipment that did not need to be replaced. He also claims that Northrop certified to the government that the designs for certain testing equipment were complete, when in fact they were not, thereby prompting the government to pay Northrop money to which it was not entitled. Like Robinson, Austrheim alleges that Northrop charged the government for labor that was not performed and, like Fredericks, he alleges that Northrop received payment to which it was not entitled

after it falsely certified to the government that certain projects were complete.

In count II of the complaint, which concerns only state law claims, Robinson and Austrheim allege that Northrop officials harassed them and then discharged them in retaliation for their efforts to stop Northrop's fraudulent practices. Holzrichter and Fredericks also assert that they were harassed as a result of their criticisms of Northrop's practices, and Fredericks ultimately was discharged, but neither Holzrichter nor Fredericks brings a state law claim for retaliatory discharge.

## DISCUSSION

### Motion to Dismiss Pursuant to Fed. R.Civ.P. 9(b) and 12(b)(6)

On January 8, 1993, this court dismissed count I of plaintiffs' complaint without prejudice, holding that plaintiffs had not alleged fraud under the FCA with the specificity required by Fed.R.Civ.P. 9(b). *United States ex rel. Robinson v. Northrop Corp.*, 149 F.R.D. 142 (N.D.Ill. 1/8/93). This court afforded plaintiffs the opportunity to amend their complaint, and they have. Defendant now moves to dismiss count I and/or to strike each paragraph of count I of plaintiffs' amended complaint pursuant to Rules 9(b) and 12(b)(6).

Plaintiffs are not required to plead a wealth of evidentiary material, but must describe the outline of the fraudulent scheme and facts identifying the who, what, when and where of the fraud. This court has examined the amended complaint and finds that plaintiffs have pled sufficient detail necessary to put defendant on notice of the alleged fraud and have met Rule 9(b)'s pleading requirements. Defendant points to numerous examples in the amended complaint that it considers to be lacking in specificity. We agree with defendant that certain areas of the amended complaint lack exact details and, at times, contain superfluous information. However, that alone does not overcome the fact that plaintiffs have pled fraud with particularity. It is not necessary for this court to go through the complaint, paragraph-by-paragraph, to determine what in-

formation is extraneous to plaintiffs' claim. As the litigation proceeds, those issues will be resolved. At this stage of the litigation it is enough that plaintiffs have satisfied Rule 9(b). Defendant's motion to dismiss pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) is therefore denied.

### Motion to Dismiss Pursuant to Fed. R.Civ.P. 12(b)(1)

Defendant also moves to dismiss plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(1). It contends that *qui tam* plaintiffs lack standing to sue under Article III; that the congressional authorization of *qui tam* suits violates the Appointments Clause of Article II; that *qui tam* suits violate the principle of separation of powers; and that *qui tam* suits deprive defendants of due process. The court is not persuaded by defendant's constitutional arguments.

### Qui Tam Provisions of the FCA

The FCA provides that any person who knowingly submits a fraudulent claim for payment to the United States government is liable to the government for a civil penalty plus three times the amount of damages that the government incurs. 31 U.S.C. § 3729. Under the FCA's *qui tam* provisions a private individual may bring a civil action for FCA violations on behalf of both the government and the individual. Section 3730(b)(1). The action is brought by a *qui tam* relator in the name of the government, and the government is then given the choice between assuming control of the case, § 3730(b)(2), or allowing the original plaintiff to proceed with the suit without government involvement under § 3730(b)(4)(B). The government chose the latter course in this case.

Whether the government takes over the suit or not, the relator is entitled to a portion of the proceeds if the action is successful. If the government intervenes, the relator receives between 15 and 25 per cent of the amount recovered. § 3730(d)(1). If the government does not intervene, the relator receives between 25 and 30 per cent of the amount recovered. § 3730(d)(2).

### Whether Qui Tam Plaintiffs Have Standing Under Article III

■ Northrop contends that the FCA violates Article III of the Constitution by granting standing to private individuals to sue for fraud against the government when, according to Northrop, those individuals have not suffered any injury. Like every other court to consider the issue to date, this court rejects Northrop's Article III attack.

■ A plaintiff seeking standing to sue in federal court must pass both constitutional and prudential hurdles. The case-and-controversy requirement of Article III of the Constitution permits a federal court to hear a lawsuit only if the plaintiff bringing the suit alleges "a personal stake in the outcome of the controversy" sufficient to warrant the court's use of its remedial powers on the plaintiff's behalf. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The requirement limits federal court jurisdiction to disputes concerning "some threatened or actual injury" to the plaintiff stemming from some putatively illegal act by the defendant. *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). *See also Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975). Assuming a case has met the minimum standards imposed by Article III, it still may be kept out of federal court for prudential or policy reasons. For example, when the injury asserted by the plaintiff is a general harm affecting the citizenry as a whole, an individual plaintiff usually will not be able to go forward with his or her case because, as the Supreme Court has explained, such matters are generally best left to Congress. *See e.g., Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). *But cf., United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687–88, 93 S.Ct. 2405, 2415–16, 37 L.Ed.2d 254 (1973) (noting that a plaintiff who claims a direct injury will not be denied standing simply because the alleged injury stems from a government action that has widespread effect).

In this case Northrop alleges that plaintiffs have suffered only a generalized injury. If

Northrop had committed a fraud against the government, says Northrop, then plaintiffs would have been harmed, but only to the small degree that every taxpaying citizen in the county would have been harmed. Taxpayers frequently have claimed injury by virtue of increased expenditures caused by some improper congressional enactment or another, but, ever since *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), federal courts have rejected such suits. Analogizing from the *Frothingham* line of cases, Northrop argues that the harm caused by a marginal increase in a taxpayer's tax bill can never support a suit in federal court. Here the defendant is a defense contractor, not the United States government, but, according to Northrop, if a few extra pennies on a tax bill is too paltry a sum to justify a suit against the government, then it is too paltry a sum to justify a lawsuit against anyone, including Northrop.

However, as the Supreme Court stated in *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968):

[I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution. It is for that reason that the emphasis in standing problems is on whether the party invoking federal court jurisdiction has "a personal stake in the outcome of the controversy," *Baker v. Carr, supra* [369 U.S.] at 204 [82 S.Ct. at 703], and whether the dispute touches upon "the legal relations of parties having adverse legal interests." *Aetna Life Insurance Co. v. Haworth,* [300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) ].

■ This case meets the *Flast* standards. Assuming that Northrop did commit the fraud of which it is accused, there can be no doubt that individual taxpayers suffered only the tiniest injuries as a result of it. Plaintiffs do not deny that. As they point out, however-er, they are not typical taxpayers. They were also unwilling participants in the alleged fraud. Moreover, by virtue of the FCA, a considerable amount of money is at stake for them. Defendant protests that plaintiffs' incentive to litigate this case is an artificial creation—that virtually nothing would be at stake for them had Congress not enacted the *qui tam* provisions of the FCA. That argument is unpersuasive because Congress bears the primary responsibility for deciding what will and will not be considered an injury under federal law. "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2.

■ Injuries that were unrecognized or uncompensated in federal court in the absence of federal statutes often have become the basis for colorable lawsuits by virtue of congressional enactments. Classic examples are found in the area of discrimination law. Prior to the civil rights legislation of the 1960s, it would have been almost unthinkable for a plaintiff who had not been discriminated against personally to bring a federal law suit challenging race discrimination. Generally speaking, moral indignation is not the sort of injury that can be redressed in federal court. *See American Civil Liberties Union of Illinois v. City of St. Charles,* 794 F.2d 265, 268 (7th Cir.1986), *cert. den.,* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986); *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Tileston v. Ullman,* 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943). After the enactment of the Civil Rights Act of 1968, however, the U.S. Supreme Court unanimously held in *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), that a plaintiff need not allege that he or she was the object of discrimination in order to have standing to challenge that discrimination. *Trafficante* involved the intentional exclusion of African–Americans from an apartment complex. The suit was brought by two tenants of the development, one of them African–American, the other Caucasian. The Court held that both tenants had standing to sue pursuant to the Civil Rights Act, 42 U.S.C. § 3610(a). While acknowledging that the African–Americans who had been excluded from the complex had been "damaged the

most," the Court explained that the tenants who lived there also were injured because they were denied the right to live in an integrated environment. *Id.* at 210, 93 S.Ct. at 367. Significantly, in a concurring opinion by Justice White, three justices indicated that the plaintiffs' suit would not have met the case-and-controversy requirement had Congress not passed the statute under which they sued. *Trafficante*, 409 U.S. at 212, 93 S.Ct. at 368 (White, J., concurring). The *Trafficante* principle has been applied to the workplace as well: Caucasian employees have standing to challenge their employers' hiring and promotion practices that have a discriminatory impact on African–Americans. *See e.g., Stewart v. Hannon*, 675 F.2d 846, 848–49 (7th Cir.1982).

As the *Trafficante* Court acknowledged, the Civil Rights Act gave standing to any person aggrieved, and it defined "person aggrieved" as any person who claimed "to have been injured by a discriminatory housing practice." 409 U.S. at 208, 93 S.Ct. at 366. With those words, the Act conferred standing on anyone who was touched by discrimination; because allegations of the slightest sort of injury would suffice to create standing under the statute, the Court found that the two tenants were entitled to pursue their claims. Here the plaintiffs are in a very similar position to the tenants in *Trafficante*. Plaintiffs do not claim to have been the primary targets of Northrop's allegedly fraudulent practices, but they do claim to have been injured. Like the tenants who were denied the benefit of living in an integrated community, plaintiffs here allegedly were denied the benefit of working for an honest business. Like the tenants who suffered embarrassment because they resided in a segregated building, plaintiffs here suffered embarrassment because they worked for a company that allegedly had perpetrated a fraud on the government. In addition, although *Trafficante* did not mention the risk of retaliation imposed on those who complain about race discrimination, plaintiffs in this case emphasize that employees of companies that commit fraud are often forced to choose between keeping silent about the fraud, and suffering potential liability (and guilty consciences), or reporting the fraud and suffering repercus-

sions, some as extreme as dismissal. In many circumstances such injuries might not suffice to create standing, but because of the FCA they do in this case.

This court realizes that the *qui tam* provisions of the FCA do not explicitly grant employees a right to work for an honest company, or a right not to suffer embarrassment due to one's work for a company that has committed a fraud on the government, or a right not to have to worry about illegal acts whose discovery and reporting can lead to retaliation in the workplace, but the Civil Rights Act was not explicit in granting the right to live in an integrated community, either. By structuring the FCA as it did, Congress established that anyone with personal knowledge concerning a fraud on the government has a real stake in stopping that fraud, 31 U.S.C. § 3730(e)(4)(A), and by recognizing such rights this court merely restates that congressional determination. Other courts have upheld the constitutionality of the *qui tam* provisions for similar reasons. *See e.g., United States ex rel. Burch v. Piqua Engineering, Inc.,* 803 F.Supp. 115, 119 (S.D.Ohio 1992); *United States ex rel. Newsham v. Lockheed Missiles and Space Co., Inc.,* 722 F.Supp. 607, 614 (N.D.Cal. 1989); *United States ex rel. Stillwell v. Hughes Helicopters, Inc.,* 714 F.Supp. 1084, 1098 (C.D.Cal.1989).

The court also realizes that the amount plaintiffs stand to gain if they prevail in their *qui tam* action far exceeds the amount they would have gained had their damages been limited to the amount that Northrop's acts caused their tax bills to rise, or the amount they would have gained had their damages been limited to compensation for the harms they incurred directly. There is nothing unconstitutional about that apparent disproportionality. Congress frequently authorizes compensation of plaintiffs in amounts greater than actual damages suffered. One example is found in the civil racketeering statute. 18 U.S.C. § 1964(c) (authorizing awards of threefold damages in civil racketeering suits). Another is found in the Civil Rights Act of 1991. 42 U.S.C. § 1981a(b)(1) (authorizing punitive damage awards in civil rights suits). In fact, the

treatment by federal courts of enhanced damage awards lends further support to this court's conclusion that plaintiffs have standing to sue. A plaintiff who wins only nominal compensatory damages but $1,000 in punitive damages will be considered a prevailing party for the purposes of awarding attorneys' fees under fee-shifting statutes, and may be compensated fully for litigation costs, *see Ustrak v. Fairman*, 851 F.2d 983, 989 (7th Cir.1988), *cert. den.*, 479 U.S. 824, 107 S.Ct. 95, 93 L.Ed.2d 47 (1986), but a plaintiff who wins only nominal damages and no other relief will not be compensated for costs. *See Farrar v. Hobby*, —— U.S. ——, ——, 113 S.Ct. 566, 575, 121 L.Ed.2d 494 (1992). As the Supreme Court has explained, the reason for awarding fees in the former kind of case, but not the latter, is that bringing suit is appropriate when the plaintiff seeks to "modify the defendant's behavior in some way that directly benefits the plaintiff," *id.* at ——, 113 S.Ct. at 573, as occurs when *any* kind of damages or equitable remedies are awarded, but bringing suit is inappropriate when the only advantage to be gained from suing is moral satisfaction. *Id.* at ——, 113 S.Ct. at 574. In this case, as in all *qui tam* actions brought under the FCA, much more than the litigants' moral satisfaction is at stake. The private cause of action established by the FCA creates great financial incentives for both *qui tam* relators and defendants to litigate their causes zealously. As a result, FCA disputes are guaranteed to be "presented in an adversary context" and, in a nutshell, that guarantee is what *Flast* requires. 392 U.S. at 101, 88 S.Ct. at 1953.

■ The court also would point out that the government is alleged to have suffered a major palpable injury in this case, and that the FCA effectively assigned or transferred part of the government's interest in recovering for that injury to the plaintiffs. "[I]f an injured person assigns his right of action to someone else, the assignee has standing to enforce the right even though he is not the one who was injured by the defendant's wrongdoing." *National Ass'n of Realtors v. National Real Estate Ass'n, Inc.*, 894 F.2d 937, 941 (7th Cir.1990). The assignment effected by the FCA was not a typical one, for there was no contract or gift involved, but

that does not mean that it did not occur. *United States Dept. of Housing and Urban Development ex rel. Givler v. Smith*, 775 F.Supp. 172, 181 (E.D.Pa.1991); *Stillwell*, 714 F.Supp. at 1098. Congress is free to transfer governmental interests through statutory enactments if it wants to do so. By recognizing that congressional power, this court is not allowing Congress to "circumvent" Article III. *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir.1990). Rather the court is recognizing that the existence of a case-and-controversy depends in large measure on the substantive rights that Congress has conferred. "[W]here a dispute is otherwise justiciable, the question whether the litigant is a 'proper party to request an adjudication of a particular issue' ... is one within the power of Congress to determine." *Sierra Club v. Morton*, 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 1365 n. 3, 31 L.Ed.2d 636 (1972) (quoting *Flast*, 392 U.S. at 100, 88 S.Ct. at 1952). Congress cannot give standing to one person to redress another person's rights, *id.*, but it can transfer the rights of the United States to private citizens, and because it did just that through the FCA, plaintiffs have standing to sue in this case.

### Whether the Qui Tam Provisions Violate the Appointments Clause of Article II

■ The Appointments Clause of Article II confers on the Executive Branch of government the power to appoint, with the advice and consent of the Senate, all "Ambassadors, other Public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States." The clause also states that Congress may vest the power to appoint "inferior Officers" in the President alone, in the courts, or in the heads of the various executive branch departments. The parties agree that the *qui tam* plaintiffs were not appointed in the manner described by the Appointments Clause, having decided, on their own accord, to litigate this case. Plaintiffs see nothing wrong with that because, they contend, they are not "Officers of the United States." The court agrees.

In *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court invalidated provisions of the Federal

Campaigns Act that created a commission, with some members appointed by Congress, to enforce the substantive provisions of the Act. Because the commission members were not selected in conformity with the Appointments Clause, the actions of the commission were held unconstitutional. The Court stated that Congress could not create a commission, choose some of its members, and vest it with "primary responsibility for conducting civil litigation in the courts of the United States for vindicating public rights." 424 U.S. at 140, 96 S.Ct. at 692. *Buckley* is important law, but, contrary to defendant's assertions, it does not govern this case. Concerned primarily with direct congressional usurpation of executive power, *Buckley* did not address the role of private litigants. *See Natural Resources Defense Council, Inc. v. Outboard Marine Corp.*, 692 F.Supp. 801, 816 (N.D.Ill.1988).

Unlike the public rights that the Federal Election Commission sought to protect in *Buckley*, the rights at issue in this case are not purely public in nature. The False Claims Act grants substantive rights to particular private citizens. Since the plaintiffs bring this suit for themselves, as well as for the government, 31 U.S.C. § 3730(b)(1), and seek to vindicate rights that Congress gave specifically to *them*, it follows that they are not "Officers of the United States," as that phrase is used in Article II. If they were, then every plaintiff whose lawsuit raised issues concerning the public interest, or who stood to win punitive as well as compensatory damages, would be considered an "Officer of the United States." And that, plainly, is not the case. As the Supreme Court noted in *Davis v. Passman*, 442 U.S. 228, 241, 99 S.Ct. 2264, 2275, 60 L.Ed.2d 846 (1979):

> Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress, in creating these rights and obligations, to determine in addition who may enforce them and in what manner.

Accordingly, the court finds that the *qui tam* provisions of the FCA do not violate Article II.

## Whether the Qui Tam Provisions Violate the Separation of Powers Principal

 Defendant falls back on the argument that the *qui tam* provisions violate not just Article II but the general principle of separation of powers. The principle of separation of powers is derived from all of the first three articles of the Constitution taken together, and it encompasses more than the specific directives contained within them. As the Supreme Court has said, the principle of separation of powers is "woven into" the Constitution. *Buckley*, 424 U.S. 124, 96 S.Ct. at 684. Theoretically, therefore, a congressional act may comport with all of the explicit terms of the Constitution but still be void for separation of powers considerations. *Morrison v. Olson*, 487 U.S. 654, 685, 108 S.Ct. 2597, 2615, 101 L.Ed.2d 569 (1988). In this case, however, the court perceives no separation of powers violation.

In *Morrison*, the Supreme Court upheld the independent counsel provisions of the Ethics in Government Act, 28 U.S.C. §§ 591–599. The Act authorized a special division of the federal judiciary to appoint prosecutors to conduct investigations of and, if necessary, to bring criminal prosecutions against members of the Executive Branch. Observing that Congress retained virtually no powers of control or supervision over the independent counsels, the Supreme Court concluded that the law did not involve an attempt "by Congress to increase its own powers at the expense of the Executive Branch." 487 U.S. at 694, 108 S.Ct. at 2621. Here Congress has even less control over the *qui tam* plaintiffs than it had over the independent counsels at issue in *Morrison*, for Congress cannot even remove the *qui tam* plaintiffs through impeachment proceedings. Congressional influence over the plaintiffs in this lawsuit "began and ended with the passage of the FCA." *United States ex rel. Newsham v. Lockheed*, 722 F.Supp. 607, 611 (N.D.Cal.1989). At the same time, the Executive Branch has considerably more power over the *qui tam* plaintiffs than it had over the independent counsels. It is true that a *qui tam* plaintiff may initiate proceedings under the FCA without authorization from the Executive Branch, while there will never be an appointment of

an independent counsel under the Ethics in Government Act unless the Attorney General so requests, but the FCA authorizes the Justice Department to take over any *qui tam* suit. 31 U.S.C. § 3730(c)(3). If the government chooses not to, as in this case, it still may settle the suit, or move to dismiss it, even if the *qui tam* plaintiff objects. 31 U.S.C. § 3730(c)(2)(A and B). In contrast, under the Ethics in Government Act the Attorney General loses virtually all control over an independent counsel once the independent counsel is appointed. *See Morrison*, 487 U.S. at 706, 108 S.Ct. at 2627 (Scalia, J., dissenting).

Following *Morrison*, this court must conclude that separation-of-powers considerations pose no obstacle to *qui tam* suits under the FCA. Yet the strongest reason for finding no separation-of-powers violation is not contained in *Morrison*. Defendant argues that the Constitution gives Congress the power to make the laws and the Executive Branch the power to enforce them, but defendant's vision overlooks the role of the public. Congress frequently enacts laws that confer substantive rights on private citizens, and those laws typically authorize citizens to go to court to protect the rights that Congress gave them. That in essence is what happened here. *See Atlantic States Legal Foundation v. Whiting Roll–Up Door Mfg.*, 1993 WL 114676 (W.D.N.Y. Mar. 31, 1993). It is precisely the sort of arrangement that was contemplated when the framers of the Constitution gave Congress the authority to make laws in Article I and gave the federal judiciary the authority to hear cases arising under the laws of the United States in Article III. Therefore, like every other court to consider separation-of-powers challenges to *qui tam* suits under the FCA, this court concludes that the *qui tam* provisions do not encroach upon Executive Branch prerogatives. *See e.g. United States ex rel. Burch v. Piqua Engineering, Inc.*, 803 F.Supp. 115, 119 (S.D.Ohio 1992); *United States Dept. of Housing and Urban Development ex rel. Givler v. Smith*, 775 F.Supp. 172, 177–79 (E.D.Pa.1991); *United States ex rel. Truong v. Northrop Corp.*, 728 F.Supp. 615, 622–23 (C.D.Cal.1989); *Newsham*, 722 F.Supp. 607, 611–13 (N.D.Cal.1989).

### Whether Qui Tam Prosecutions Effect a Denial of Due Process

■ Citing several criminal cases, Northrop argues that this *qui tam* suit deprives it of due process because it is brought by private plaintiffs who, unlike government attorneys, may be more committed to winning the case than to seeing that justice is done. That argument has no merit. What defendant describes is not a violation of due process but a paradigm of due process as realized in an adversarial system for adjudicating civil disputes. Plaintiffs in civil cases are allowed to be biased, and to argue zealously for their cause, because the tribunal hearing the case is impartial. The defendant's rights are protected by the tribunal—this court. *See* Monroe Freedman, Lawyers' Ethics in an Adversary System 9 (1975). In FCA *qui tam* actions, moreover, defendants are further protected because their rights are monitored not only by the trial court but, as noted above, by the Justice Department, which is entitled to intervene in or seek dismissal of any *qui tam* action brought pursuant to the FCA. The Justice Department has not intervened, and this court has no reason to suspect that government attorneys consider the case to have been brought unjustly. Since the integrity and fairness of the court itself has not been questioned, defendant's due process argument must be rejected.

### Discovery of Plaintiffs' Statement to the Attorney General

■ In addition to its motions to dismiss, Northrop has submitted a motion to compel production of the statement of substantially all material evidence and information that plaintiffs were obligated to provide to the Attorney General when they filed this lawsuit. 31 U.S.C. § 3730(b)(2). Plaintiffs contend that the statement is attorney work product and therefore nondiscoverable under Fed.R.Civ.P. 26(b)(3). Northrop responds that plaintiffs have already turned the document over to a non-party, the government, and that, in any event, § 3730(b)(2) requires only a statement of facts. Because the document should not contain opinions of an attorney, and because it already has been shown to persons other than the plaintiffs and their

representatives, Northrop contends that it should be allowed to examine it. The court agrees with Northrop and notes that other federal district courts handling similar discovery controversies have also compelled production of *qui tam* plaintiffs' statements to the government.[1] *See e.g., United States ex rel. Stone v. Rockwell International Corp.,* 144 F.R.D. 396, 401 (D.Colo.1992); *Grand ex rel. United States v. Northrop,* 811 F.Supp. 333, 337 (S.D.Ohio 1992).

## CONCLUSION

For the reasons stated, defendant's two motions to dismiss are denied and its motion to compel production of plaintiffs' statement to the government is granted.

---

1. To protect the secrecy of attorney work product, those courts have ordered redaction from the statements of any analysis and opinions of plaintiffs' attorneys. Plaintiffs have not asked the court to take that step in this case.